# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# GAINESVILLE DIVISION

Case No. 1:17-cv-00018-MCR-GRJ

MATTHEW BRUCE HINTZE and
LARINA K. HINTZE,

Appellants,

v.

JOHN SPENCE, SHEILA SPENCE,
INTERMED BIOMEDICAL SERVICES, INC.,
DAVID WHITNEY, and
FLH HOLDINGS OF FLORIDA, LLC,

Appellees.

_____/

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF FLORIDA

## INITIAL BRIEF OF APPELLANT

Jason H. Baruch
Patrick M. Chidnese
Holland & Knight LLP
P.O. Box 1288
Tampa, FL 33601

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................... i

TABLE OF AUTHORITIES.................................................................. ii

JURISDICTIONAL STATEMENT......................................................... 1

STATEMENT OF THE ISSUES ........................................................... 2

STATEMENT OF THE CASE AND FACTS ........................................... 3

SUMMARY OF THE ARGUMENT.................................................... 11

ARGUMENT ................................................................................ 11

I.    THE ASSETS TRANSFERRED WERE NOT "PROPERTY OF
      THE DEBTOR."................................................................... 12

II.   VEIL-PIERCING UNDER § 727(a)(2)  IS AN
      UNESTABLISHED AND DISFAVORED CONCEPT THAT
      APPLIES FLORIDA LAW BACKWARDS.................................... 16

III.  EVEN IF VEIL-PIERCING WERE A VALID AVENUE TO
      SATISFY  THE "PROPERTY" ELEMENT IN § 727(A)(2), THE
      FACTS HERE DO NOT SATISFY FLORIDA'S "STRICT" AND
      "EXTRAORDINARY" STANDARD. ............................................ 18

      A.   Florida's "Exceptional" Standard............................................ 18

      B.   The Findings IN the Opinion Satisfy None of the Three
           Elements for Veil-Piercing Under Florida Law. ............................... 22

           1.   TZI's Independent Existence.................................................. 22

           2.   No Fraudulent or Improper Purpose Under Florida Law......... 24

           3.   No Injury to Appellees ................................................... 28

CONCLUSION ............................................................................. 30

CERTIFICATE OF COMPLIANCE .................................................. 31

CERTIFICATE OF SERVICE........................................................... 31

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                           **Page(s)**

*111 Properties, Inc. v. Lassiter*,
 605 So. 2d 123 (Fla. 4th DCA 1992) ............................................................ 20, 24

*A. v. Lama*,
 633 F.3d 1330 (11th Cir. 2011)........................................................ 18, 21, 23, 26

*Armour & Co. of Delaware v. B. F. Bailey, Inc.*,
 132 F.2d 386 (5th Cir. 1942)................................................................................ 8

*Barnes v. Liebig*,
 1 So. 2d 247 (Fla. 1941) ................................................................................... 17

*In re Bayshore Yacht & Tennis Club Condo. Ass'n., Inc.*,
 336 B.R. 866 (Bankr. S.D. Fla. 2006)............................................................... 28

*Brunner v. New York State Higher Educ. Services Corp.*,
 831 F.2d 395 (2d Cir. 1987).......................................................................*passim*

*In re Bull*,
 528 B.R. 473 (M.D. Fla. 2015) ......................................................................... 19

*In re Colodner*,
 147 B.R. 90 (Bankr. S.D.N.Y. 1992) ............................................................... 15

*State ex rel. Cont'l Distilling Sales Co. v. Vocelle*,
 27 So. 2d 728 (Fla. 1946).................................................................................. 19

*Eagle v. Benefield-Chappell, Inc.*,
 476 So. 2d 716, 719 (Fla. 4th DCA 1985) ....................................................... 21

*In re Friedlander Capital Mgmt. Corp.*,
 411 B.R. 434 (Bankr. S.D. Fla. 2009)............................................................... 17

*Gasparini v. Pordomingo*,
 972 So.2d 1053, 1055 (Fla. 3d DCA 2008) ...................................................... 19

*Hilton Oil Transp. v. Oil Transp. Co., S.A.*,
 659 So. 2d 1141 (Fla. 3d DCA 1995) .......................................................... 21, 23

*Houri v. Boaziz,*
   196 So. 3d 383 (Fla. 3d DCA 2016) ............................................................ 19, 22

*Inversiones de Centro Am., S.A. (EPICA) v. Swiss Bank Corp.*
   *(Overseas) S.A.,*
   507 So. 2d 1119 (Fla. 3d DCA 1987) .............................................................. 17

*Kaufman v. Harder,*
   354 So. 2d 109 (Fla. 3d DCA 1978) ............................................................... 29

*Lipsig v. Ramlawi,*
   760 So. 2d 170 (Fla. 3d DCA 2000) ............................................................... 19

*Molinos Valle Del Cibao, C. por A. v. Lama,*
   633 F.3d 1330, 1349 (11th Cir. 2011) ............................................................ 19

*Matter of Myrick,*
   172 B.R. 633 (Bankr. D. Neb. 1994) .............................................................. 15

*Mysels v. Barry,*
   332 So. 2d 38 (Fla. 2d DCA 1976) ................................................................. 17

*Riley v. Fatt,*
   47 So. 2d 769 (Fla. 1950) ............................................................................... 26

*Schwartz v. Spectratech Ink Co.,*
   568 So. 2d 544 ......................................................................................... 21, 23

*In re Scott,*
   462 B.R. 735 (D. Alaska 2011) ................................................................. 16, 26

*Seminole Boatyard, Inc. v. Christoph,*
   715 So. 2d 987 (Fla. 4th DCA 1998) ............................................................. 20

*In re Sharp Intern. Corp.,*
   403 F.3d 43, 54–55 (2d Cir. 2005) ................................................................ 27

*Sirmons v. Arnold Lumber Co.,*
   167 So. 2d 588 (Fla. 2d DCA 1964) .............................................................. 17

*In re Srour,*
   138 B.R. 413 (Bankr. S.D.N.Y. 1992) ...................................................... 14, 25

*In re Thurman,*
   901 F.2d 839 (10th Cir. 1990)...............................................................14, 15, 25

*Matter of VanBrocklin,*
   566 B.R. 90 (Bankr. N.D. Ga. 2017)..................................................................14

*In re Wagner,*
   305 B.R. 472 (8th Cir. 2004)..............................................................................13

**Statutes**

11 U.S.C. § 727(a)(2)(A)...............................................................................*passim*

28 U.S.C. § 157 ....................................................................................................... 1

28 U.S.C. § 158(a)................................................................................................... 1

Florida Statutes § 55.52........................................................................................ 25

Florida Statutes § 62.37........................................................................................ 25

**Other Authorities**

Federal Rule of Bankruptcy Procedure 8002(a)(1) ................................................. 1

*Investopedia, available at*
   http://www.investopedia.com/terms/p/pumpanddump.asp.................................. 9

## JURISDICTIONAL STATEMENT

Appellants, Matthew Hintze ("Hintze") and Larina Hintze (collectively the "Hintzes"), file this appeal under 28 U.S.C. § 158(a), which authorizes appeals from final judgments of bankruptcy judges entered in cases referred to bankruptcy courts under 28 U.S.C. § 157. Section 157(b)(2)(J), in turn, refers core proceedings, including objections to discharge, to bankruptcy judges. This appeal involves an appeal of a final judgment denying a bankruptcy discharge. (Bankr. Doc.[1] 916.) Accordingly, this Court has jurisdiction over this appeal. The Hintzes filed a Notice of Appeal on January 27, 2017 (Bankr. Doc. 919), within 14 days of the judgment entered on January 13, 2017. Thus, this appeal is timely under Federal Rule of Bankruptcy Procedure 8002(a)(1).

The bankruptcy court's findings were supplemented and further appealed within fourteen days. (Bankr. Doc. 935 (amended findings dated February 9, 2017) & Doc. 943 (Amended Notice of Appeal dated February 14, 2017).) Finally, the bankruptcy court entered an order in the main bankruptcy case to accompany the order denying discharge in the adversary case, and the Hintzes further appealed that judgment within fourteen days. (Main Bankr. Case No. 12-10462, Doc. 721

---

[1] In their record citations, the Hintzes will refer to filings in the adversary case at issue in this appeal, Adversary Case Number 13-01007, as "Bankr. Doc. ___". The Hintzes will cite to filings in the main bankruptcy expressly as such.

(judgment dated April 7, 2017) & Doc. 723 (Notice of Appeal dated April 20, 2017).) Thus, the Hintzes timely appealed all judgments at issue in this appeal.

## STATEMENT OF THE ISSUES

1. Were assets of a non-debtor company "property of the debtor" under 11 U.S.C. 727(a)(2)(A)? Assuming all facts in the bankruptcy court's findings as true, the standard of review to determine the legal effect of those facts is *de novo*. *E.g.*, *Brunner v. New York State Higher Educ. Services Corp.*, 831 F.2d 395, 396 (2d Cir. 1987) ("While this court is obliged to accept the bankruptcy court's undisturbed findings of fact unless they are clearly erroneous, it is not required to accept its conclusions as to the legal effect of those findings.").

2. Did the bankruptcy court properly pierce the corporate veil in order to satisfy the element in issue number 1 above, and if so, is veil-piercing an available avenue to do so in this circuit? Assuming all facts in the bankruptcy court's findings as true, the standard of review to determine the legal effect of those facts is *de novo*. *Id.*

3. Did the Hintzes "destroy" their property under 11 U.S.C. § 727(a)(2) by transferring assets in a company to a third party, when the bankruptcy court later sold those membership interests in that company for $120,000? Assuming all facts in the bankruptcy court's findings as true, the standard of review to determine the legal effect of those facts is *de novo*. *Id.*

## STATEMENT OF THE CASE AND FACTS

The bankruptcy court entered a final judgment against the Hintzes on Count VIII of Appellees' complaint objecting to discharge.  (Bankr. Doc. 916.)  The Hintzes will assume as true all facts stated in the bankruptcy court's Amended Findings of Facts, Conclusions of Law and Memorandum Opinion in Support of Final Judgment. (Bankr. Doc. 935.)  In formulating the findings in the opinion, the bankruptcy court relied on a summary judgment order that purported to make 18 "factual findings," in the court's words, having "considered" the "facts determined in a partial summary judgment prior to trial." (Bankr. Doc. 860.)  A summary of the court's findings follows.

At the time they filed their Chapter 7 bankruptcy proceeding on November 1, 2012, the Hintzes owned membership interests in a company called TutoringZone, LC ("TZ1").  (Bankr. Doc. 935 at 2.)  TZ1 offered tutoring services to university students in Gainesville, Florida. (*Id.*)  TZ1 had been in business for nearly a decade before the bankruptcy filing.  (*Id.* n. 1.)  Despite the bankruptcy court's ultimate decision to pierce the corporate veil to find TZ1's assets to be "property of the debtor," TZ1 had its own "valuable assets," bank accounts, management team known as an "advisory board," and "good will."  (*Id.* at 6, 16, 28-29.)

TZ1 remained a successful and profitable business until Ethan Fieldman ("Fieldman"), a competitor who owned a tutoring company called "Study Edge," set

3

out to defeat TZ1's business and Hintze's financial wherewithal. For five years beginning in 2011, Fieldman was Hintze's 50% partner in TZ1. (Bankr. Doc. 935 at 2.) The two men had a falling out in 2010. (*Id.*) After some state court litigation to dissolve the company, the Hintzes bought Fieldman's 50% interest in TZ1. (*Id.* at 3.)

The purchase transaction included the Appellees loaning the Hintzes, and not TZ1, $443,578 secured by promissory notes. (*Id.*) As collateral for the loan to himself, Hintze pledged TZ1's assets to Appellees. (*Id.* at 10.) The facts as presented by the court's findings indicate that TZ1's pledge of assets was unenforceable because the borrower pledged the assets of another entity for no consideration in return:

> Maker [the Hintzes] explicitly agrees that collateral for this loan includes both their personal assets as well as the assets of Tutoringzone, LC. Maker further agrees that any proceeds from the sale of any Tutoringzone, LC assets exceeding individually or collectively $10,000.00 must first be applied to the Holder's debt and accumulated interest thereon.

(*Id.*)

Hintze did not obtain a non-competition agreement from Fieldman as part of the sale transaction. (*Id.* at 4.) Fieldman immediately seized on the opportunity to trounce Hintze in the tutoring market. As the bankruptcy court described it,

> A day or so after selling his 50% interest in TZ1, Mr. Fieldman caused his newly formed tutoring company,

> "Study Edge," to begin competing against TZ1 in the
> tutoring business in Gainesville, Florida.   Study Edge
> hired over half of TZ1's full-time tutors.   It located its
> business directly across from the main University of
> Florida campus, making its tutoring services more
> accessible to students than TZ1, which was located about
> a mile away. TZ1 was forced to find new people to tutor
> courses previously taught by Mr. Fieldman and others.
> Mr. Hintze took over tutoring TZ1's corporate finance and
> other finance-related courses.

(*Id*. at 4.) Fieldman's offensive immediately harmed TZ1 in the market:

> Immediately after Study Edge began competing, TZ1
> suffered a severe downturn in revenues and cash flow.
> Defendants began meeting frequently with Plaintiffs to
> discuss TZ1's economic woes and ideas from primarily
> Mr. Hintze for turning TZ1's business around. Defendants
> tried different ways to bring TZ1's business back.  At one
> point, they had Ms. Hintze take a more active role with
> TZ1 that included managing the tutors.   This apparently
> made the situation worse: . . . By May of 2012, Defendants
> reported to Plaintiffs that TZ1 would not have enough
> money to make payroll during the summer and into the
> fall.

(*Id*. at 5.)

Facing these challenges designed by Fieldman, Hintze began formulating a

plan to save his business from ruin.  He approached his long-time friend and mentor,

Christopher James ("James"), for additional funding.  (*Id*.)   James is a Professor of

Finance at the University of Florida.  (*Id*. n. 9.)   James loaned Hintze money in order

to save the business.  (*Id*. at 6.)

As a part of the loan transaction, James formed a new entity, owned 90% by James and 10% by his assistant, Cynthia Frenchman. The new entity was called Tutoring Zone, II ("TZ2"). TZ2 received certain of TZ1's valuable assets through an Intellectual Property Lease (the "IP Transfer"). (*Id.* at 6-7.) The remainder of TZ1's assets were not transferred to TZ2, but rather, were sold in private sales, according to the bankruptcy court. (*Id.* n. 11.)

The IP Transfer required payment to TZ1 of $75,000 for the transfer of assets to TZ1. (*Id.* at 7.) The bankruptcy court's findings appear unclear as to whether TZ1 received consideration for the IP Transfer. On the one hand, the court found that

> TZ1 received no cash or other payment for the transfer of its assets to TZ2. The only consideration for the IP Transfer went to Defendants, individually: James released them from liability for $200,000 of the $475,000 they owed him prior to the IP Transfer.

(*Id.* at 8-9.) But on the other hand, the court also found

> TZ1 executed an Intellectual Property Lease that required James and Frenchman, the "Lessees" of the above-described assets, to pay TZ1 $75,000. . . . The $75,000 was due in a lump sum, but James paid it in three $25,000 installments.

(*Id.* at 7; *id.* n. 11.) As a result, it appears that the court found that there was no consideration for the "transfer," but only if you exclude the lease payment from the concept of "consideration" for a "transfer."

6

The transfers from TZ1 to TZ2, according to the bankruptcy court, "rendered TZ1 insolvent and Defendants' membership interests in TZ1 worthless." (*Id.* at 9.) After the transfer, according to the bankruptcy court, TZ2 began operating the same tutoring business as TZ1 had done, and TZ2 would formally be formed as a company the month following commencement of its operations. (*Id.*) According to the bankruptcy court, TZ2 used the same business name, telephone numbers, web address, advertising materials, logo and tutoring materials that TZ1 had used. (*Id.* at 7.) After the IP Transfer, certain tutors remained with TZ1 for several additional months, according to the bankruptcy court, so that TZ1 appeared to continue operations. (*Id.* at 7-8.) According to the bankruptcy court, "after the IP Transfer, TZ1 was left a shell with no assets and no income," while TZ2 continues under the name "Tutoring Zone," directed by Hintze. (*Id.* at 10.)

Further according to the bankruptcy court, an attorney representing James, Hintze, and TZ1 advised them not to disclose the IP Transfer to Appellees until after the Hintzes filed their bankruptcy petition. (*Id.*) Appellees were able to obtain these private, attorney-client communications because, while Hintze had been representing himself pro se, the bankruptcy court found that the crime-fraud exception to the privilege required disclosure of the communications. (*Id.* at 11.) After Hintze hired counsel to revisit the issue, the privilege was ultimately waived. (*Id.* at 12.)

The bankruptcy court appeared troubled by the internal communications between the attorney and his clients: the Hintzes and James. (*Id.* at 17.) Due to the fact that one may only infer the belief at the time that the communications would remain protected, the statements were not tailored for the scrutiny and criticism of aggressive adversaries such as exist here.

But even so, and despite the bankruptcy court's concerns, the attorney-client communications show a careful attention to the requirements of federal law and fraudulent transfer law. For example, the communications show a respect for the 90-day preference period under bankruptcy law in several instances. (*Id.* at 17-23.) While the bankruptcy court preferred to cast these attorney-client communications and strategies as a "cover up," held "in secret" to maintain a "charade" (*id.* at 23, 29-30), the communications recited by the bankruptcy court appear to be legal strategies and thoughts that would commonly remain "covered up" due to the attorney-client privilege. As James put it, "I retained counsel to ensure that I was not violating any laws and was not involved in a voidable or fraudulent transfer under bankruptcy." (*Id.* at 25, n. 67.)

Further fueling the anxieties that appear in the bankruptcy court's opinion was a cavalier reference to a "pump and dump" strategy discussed in the private, attorney-client communications between the Hintzes and their attorney.[2] According

---

[2] There is no evidence below that the Hintzes' attorney referenced in the opinion

to the bankruptcy court's recitation, however, the "pump and dump" concept discussed with the Hintzes bore no resemblance to the conventional meaning of the term—used in the criminal context of a fraudulent scheme to boost the price of stock.[3]

Rather, the pump and dump "strategy" referred to selling TZ1's intellectual property to a new company (ultimately, TZ2), relieving the Hintzes' personal debt through the bankruptcy process, and all the while, respecting the 90-day preference period under the Bankruptcy Code.  (*Id.* at 18.)  Thus, even according to the bankruptcy court's recitation, the Hintzes' version of "pump and dump" was not found to be an actual "pump and dump" according to the prescribed meaning of the term, and further, demonstrated both the Hintzes' and their counsel's deliberate efforts to stay clear within the bounds of the law.

In its opinion, the bankruptcy court acknowledged that the assets transferred from TZ1 to TZ2 were not "property of the debtor" sufficient for the purposes of

---

used the expression "pump and dump," but this brief will not further address this issue because, as stated at the outset, this appeal accepts all the findings in the lower court's opinion as true for the purposes of the standard of review.

[3] The correct meaning of a "pump and dump" in the investment world is very different from the meaning employed by the Hintzes.  "Pump and dump is a scheme that attempts to boost the price of a stock through recommendations based on false, misleading or greatly exaggerated statements."  *Investopedia, available at* http://www.investopedia.com/terms/p/pumpanddump.asp.

denying a discharge under 11 U.S.C. § 727(a)(2)(A). (*Id.* at 13.) But the bankruptcy court formulated another avenue—veil-piercing—to deny the Hintzes' their discharge. As the court put it,

> Because the assets transferred belonged to TZ1 and not the Defendants, individually, a determination that Defendants transferred "property of the debtor" turns on whether TZ1 was Defendants' alter ego. A ruling that TZ1 was Defendants' alter ego amounts, in essence, to piercing the corporate veil.

(*Id.* at 25.)

To deny a discharge, the bankruptcy court ultimately pierced the corporate veil, finding TZ1 to have no separate existence from the Hintzes because, according to the bankruptcy court, they used the corporate form fraudulently. (*Id.* at 26.) As an alternative to support the same result, the bankruptcy court also found that the Hintzes had "destroyed their property, comprised of their membership interests in TZ1." (*Id.* at 32.) The bankruptcy court found that TZ1's value had been "destroyed," even though it had previously entered an order for the sale of TZ1's assets for $120,000 on March 17, 2016. (Main Bankr. Case No. 12-10462, Doc. 580.)

As a result of these findings, the bankruptcy court denied the Hintzes a discharge under § 727(a)(2) of the Bankruptcy Code. (Bankr. Doc. 935 at 35.) This appeal followed. For the reasons stated below, the judgment should be reversed.

## SUMMARY OF THE ARGUMENT

The IP Transfer was not "property of the debtor" under 11. U.S.C. § 727(a)(2), a strictly applied concept under established federal circuit court law. An attempt to circumvent this requirement through veil-piercing is disfavored and not the law of this circuit. Further, even if veil-piercing were available for this unusual purpose, the court's findings below fell far short of meeting the elements of veil-piercing under Florida law. In fact, the bankruptcy court's findings satisfy none of the three required elements. Finally, the bankruptcy court's alternative theory—that the IP Transfer "destroyed" the Hintzes' membership interests in TZ1—also fails under the facts presented. A substantial number of TZ1's assets were sold on several occasions outside of the IP Transfer for cash. Thus, the value of the membership interests were not destroyed and this alternative basis likewise does not support a denial of discharge under § 727(a)(2)(A).

## ARGUMENT

Section 11 U.S.C. 727(a)(2)(A) states,

> The court shall grant the debtor a discharge, unless . . . the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, **destroyed**, mutilated, or concealed—(A) **property of the debtor**, within one year before the date of the filing of the petition.

(emphasis added).  As the bankruptcy court correctly noted, "provisions denying discharge are generally construed liberally in favor of debtors and strictly against creditors." (Bankr. Doc. 935 at 13 (citing *In re Jones*, 490 F.2d 452 (5th Cir. 1974).)

Here, under the law discussed below, courts addressing the element of "property of the debtor" consider it a strict requirement.  The bankruptcy court's attempt to satisfy the requirement by piercing the corporate veil fails entirely under both Florida and federal law.  Likewise, the bankruptcy court's alternative finding that the Hintzes "destroyed" their property interests in TZ1 fails as a matter of law under the court's own findings.  For these reasons, the judgment below errs as a matter of law and should be reversed.

## I.   THE ASSETS TRANSFERRED WERE NOT "PROPERTY OF THE DEBTOR."

Section 727(a)(2)(A) expressly requires that the transferred assets be "property of the debtor."  Opinions throughout the country emphasize this strict requirement, including the First, Tenth, and Eighth Circuits.  The specific issue here is whether the Hintzes' "derivative" interest in owning their TZ1 membership interests satisfies the requirement, recited at length below, of a "direct proprietary interest" in the transferred assets as required by the statute.  It does not.

According to the Eighth Circuit,

> Although [Debtor] Wagner was a shareholder of Wagner
> Industries, the proceeds transferred were not his property.

>Arguments to the contrary simply fail to consider the language employed by Congress in the adoption of 11 U.S.C. § 727(a)(2)(A).  Had Congress intended to include the transfer of property of another entity, it could have included that, but the language in subsection (2)(A) is sufficiently clear to eliminate such an interpretation.  *In re Thurman*, 901 F.2d 839, 841 (10th Cir. 1990).  Where, as here, the statute's language is plain, the sole function of the courts is to enforce it according to its terms.

*In re Wagner*, 305 B.R. 472, 475-76 (8th Cir. 2004) (marks and citations omitted).

Further,

>the debtor must have more than a mere derivative interest in the property in question because the term "property of the debtor," as expressed in 11 U.S.C. § 727(a)(2)(A), has reference to property in which the debtor has a direct proprietary interest. . . .  Congress intended to limit the reach of § 727(a)(2)(A) only to those transfers of property in which the debtor has a direct proprietary interest.
>
>**In this case, the property transferred was not property of the debtor, but rather property of the LLC**.

*Id.* at 476 (citations omitted; emphasis added).

Most directly on point,

>[I]t does not follow that because the debtor may have caused his corporation to transfer its assets in fraud of its creditors, it should also follow that the transfer of property of another entity should support a denial of the debtor's discharge when he is not charged with transferring any of his own property within the meaning of § 727(a)(2)(A).

*Id.* (citations omitted).

The Tenth Circuit agrees with the conclusions above.

> Congress intended to limit the reach of § 727(a)(2)(A)
> only to those transfers of property in which the debtor has
> a direct proprietary interest. [Creditor] MBank's
> argument to the contrary is creative, indeed ingenious, but
> it is not persuasive, and the district and bankruptcy courts
> correctly so concluded.
>
> . . . .
>
> We agree with both the bankruptcy and district courts that
> [debtor] Thurman and his associates acted with
> questionable ethics in effecting the transfer of the assets.
> We are unable to conclude, however, that debtor's actions
> justify the loss of his discharge or the exception of
> MBank's debt from the effect of that discharge.

*In re C.A. Thurman*, 901 F.2d 839, 842 (10th Cir. 1990), *cited in In re Watman*, 458

F.3d 26 (1st Cir. 2006) ("The bankruptcy court dismissed that claim, holding that

§ 727(a)(2) applies to the fraudulent transfer of property in which the debtor had a

direct proprietary interest, not the transfer of the property of a corporation in which

the debtor may have derivative interest.").

See also *Matter of VanBrocklin*, 566 B.R. 90 (Bankr. N.D. Ga. 2017) ("A

debtor's transfer of a company's assets, even if the debtor is an insider of the

company, does not constitute a transfer of the debtor's property for purposes of

§ 727(a)(2)."); *In re Srour*, 138 B.R. 413, 419–20 (Bankr. S.D.N.Y. 1992) ("It does

not follow that because the debtor may have caused his corporation to transfer its

assets in fraud of its creditors, it should also follow that the transfer of property of

another entity should support a denial of the debtor's discharge when he is not charged with having fraudulently transferred any of his own property within the meaning of 11 U.S.C. § 727(a)(2)(A).") (internal citations omitted); *In re Colodner*, 147 B.R. 90, 93 (Bankr. S.D.N.Y. 1992) ("the fact that the debtor may have caused IPM to transfer assets in violation of 11 U.S.C. § 727(a)(2) is insufficient to deny the debtor's discharge when he is not charged with having fraudulently transferred or concealed any of his own property or property of the debtor's individual bankruptcy estate."); *Matter of Myrick*, 172 B.R. 633, 637–38 (Bankr. D. Neb. 1994) ("In concurrence with the Tenth Circuit decision of *In re Thurman*, 901 F.2d 839 (10th Cir.1990), I conclude that § 727(a)(2)(A) does not apply to the transfer of the assets of a corporation in which the debtor is a shareholder.").

Under the ample authorities above, in order to support denial of a discharge under 11 U.S.C. § 727(a)(2)(A), the debtor must have a direct interest in the transferred assets, not a derivative interest such as ownership in a company. Here, it is undisputed that the Hintzes did not have a direct interest in the assets subject to the IP Transfer, but rather held only a derivative interest through ownership in a company. The remaining issue is whether the bankruptcy court properly could deem this "derivative" interest a "direct" interest under a veil-piercing theory. As explained below, it could not.

## II.   VEIL-PIERCING UNDER § 727(a)(2) IS AN UNESTABLISHED AND DISFAVORED CONCEPT THAT APPLIES FLORIDA LAW BACKWARDS.

There appears to be no circuit court opinion that approves veil-piercing in order to find "property of the debtor" under § 727(a)(2)(A). As one court put it,

> The statute does not provide for denial of discharge under a veil piercing or alter ego theory, and research reveals scant authority on this point. In one case from this district, *Compton v. Bonham* (*In re Bonham*), Judge Ross denied a debtor's discharge based upon fraudulent transfers made by two related corporations. Bonham operated a Ponzi scheme through her corporations, World Plus, Inc. and Atlantic–Pacific Funding Corp. She used the corporations for illegal and fraudulent purposes in violation of state and federal securities laws. The corporations were substantively consolidated with her individual case. They had also been disenfranchised by their respective states months before the bankruptcy.

> I regard *Bonham* as an exception to the majority rule, discussed above, that fraudulent transfers of corporate property are not grounds for denial of discharge in an individual's case. The facts in *Bonham* were egregious.

*In re Scott*, 462 B.R. 735, 742-43 (D. Alaska 2011) (citations omitted). Thus, the minority, "scantly" supported veil-piercing exception to § 727(a)(2)(A)—if it is even a valid legal concept—appears to apply to Ponzi scheme cases and the like involving "illegal" acts such as securities violations, and not to cases dealing with, at worst, fraudulent transfers, as alleged to exist here.

One reason for the resistance to apply veil-piercing to satisfy the "property" requirement of § 727(a)(2), further casting doubt on the concept, is that it applies the

veil-piercing concept entirely backwards: while veil-piercing, by definition, imposes liability on a shareholder to satisfy a debt, the application of veil-piercing under § 727(a)(2) would constructively convey assets to the wrongdoer shareholder to deny his discharge. This mix-up of concepts—bestowing assets instead of imposing liability—runs directly contrary to the definition of veil-piercing under Florida law, and therefore, the version of veil-piercing applied by the court below is invalid. *See, e.g.* (all emphases added):

- "The usual result of piercing the corporate veil is that the controlling shareholder or **shareholders become liable for the corporate liabilities**." *Estudios, Proyectos e Inversiones de Centro Am., S.A. (EPICA) v. Swiss Bank Corp. (Overseas) S.A.,* 507 So. 2d 1119, 1120 (Fla. 3d DCA 1987).

- "In such instances, **the individual shareholders are held personally liable for corporate debts**. There was no such showing in the instant case." *Mysels v. Barry*, 332 So. 2d 38, 40 (Fla. 2d DCA 1976).

- "[T]he mere fact that one or more individuals control the corporate activities is not sufficient **imposition of the corporate debt upon the shareholders of the corporation**." *Sirmons v. Arnold Lumber Co.*, 167 So. 2d 588, 589–90 (Fla. 2d DCA 1964).

- "It is apparent then that the theory of a subordinate or servient corporation being controlled by and being liable to a superior or dominant corporation for its acts, **so that the latter could be held liable in an action at law for the negligence of the former**, is in force in this State." *Barnes v. Liebig*, 1 So. 2d 247, 254–55 (Fla. 1941).

- "Under traditional veil piercing, a party attempts to **pierce the corporate veil in order to hold the corporate shareholders liable** for the actions of the corporation." *In re Friedlander Capital Mgmt. Corp.*, 411 B.R. 434, 440–41 (Bankr. S.D. Fla. 2009).

- Former Fifth Circuit: "Appellant also takes the position that the corporation was merely the alter ego of Bailey; that he was acting for the corporation in his dealings with appellant; that it secured the benefit of the extensions of credit; and **that it should be held accountable for all or part of the indebtedness**. The evidence does not support this contention." *Armour & Co. of Delaware v. B. F. Bailey, Inc.*, 132 F.2d 386, 388 (5th Cir. 1942).

Thus, Florida law is clear that veil piercing, by definition, involves imposing liability, not constructively imparting assets—as the lower court's opinion purports to do here.   In any case, even if § 727(a)(2) could apply under a veil-piercing theory—and it should not—the findings in the bankruptcy court's opinion fall far short of the standard to pierce the corporate veil under Florida law, as explained below.

## III.   EVEN IF VEIL-PIERCING WERE A VALID AVENUE TO SATISFY THE "PROPERTY" ELEMENT IN § 727(a)(2), THE FACTS HERE DO NOT SATISFY FLORIDA'S "STRICT" AND "EXTRAORDINARY" STANDARD.

### A. Florida's "Exceptional" Standard

As the bankruptcy court correctly found, Florida law provides the standard to pierce the corporate veil here.  (Bankr. Doc. 935 at 26.)  According to the Eleventh Circuit,

> It is black letter law in Florida that to disregard this corporate fiction and hold the corporation's owners liable—to "pierce the corporate veil"—the plaintiff must prove that: (1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence, was in fact non-existent and the shareholders were in fact alter egos of the corporation; (2) the corporate form must have been used fraudulently or for

> an improper purpose; and (3) the fraudulent or improper use of the corporate form caused injury to the claimant. *Gasparini v. Pordomingo*, 972 So.2d 1053, 1055 (Fla. 3d DCA 2008); *see also* 8A Fla. Jur. 2d *Business Relationships* § 13 (2008).

*Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1349 (11th Cir. 2011).

Under this standard,

> Even if a corporation is merely an alter ego of its dominant shareholder or shareholders, the corporate veil cannot be pierced so long as the corporation's separate identity was lawfully maintained. *Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. 3d DCA 2008) (quoting *Lipsig v. Ramlawi*, 760 So. 2d 170, 187 (Fla. 3d DCA 2000)); *Dania Jai–Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114, 1120 (Fla. 1984).

*Houri v. Boaziz*, 196 So. 3d 383, 390 (Fla. 3d DCA 2016) (internal marks omitted);

*see also Lipsig v. Ramlawi*, 760 So. 2d 170, 187 (Fla. 3d DCA 2000) ("Moreover, even if a corporation is merely an alter ego of its dominant shareholder or shareholders, the corporate veil cannot be pierced so long as the corporation's separate identity was lawfully maintained.").

The standard to meet these elements, under Florida law, is "strict," "extraordinary" and "exceptional." "Under Florida law, courts are permitted to disregard the corporate form (and pierce the corporate veil) only in the most extraordinary cases." *In re Bull*, 528 B.R. 473, 488 (M.D. Fla. 2015). Likewise, according to the Florida Supreme Court, "courts are reluctant to pierce the corporate veil and only in exceptional cases will they do so." *State ex rel. Cont'l*

*Distilling Sales Co. v. Vocelle*, 27 So. 2d 728, 729 (Fla. 1946); *see also Seminole Boatyard, Inc. v. Christoph*, 715 So. 2d 987, 990 (Fla. 4th DCA 1998) ("the Florida Supreme Court has imposed a strict standard upon those wishing to pierce a corporate veil.").

When a lower court does not meet this strict and extraordinary standard, Florida appellate courts routinely reverse lower court rulings piercing the corporate veil. According to Florida's Fourth District,

> A & M's assertion that the formation of 111 Properties was a fraud and a subterfuge to keep Lassiter from knowing that it was really Vara purchasing the property is insufficient grounds for piercing the corporate veil of 111 Properties. Although it may have been clever, it is not an example of the kind of conduct the supreme court in *Dania Jai-Alai Palace* describes as sufficient to pierce a corporate veil.
>
> ....
>
> In conclusion, because A & M failed to show sufficient evidence to warrant the piercing of any corporate veil, we reverse the final judgment against Henry D. Vara, Jr.

*111 Properties, Inc. v. Lassiter*, 605 So. 2d 123, 125–26 (Fla. 4th DCA 1992) (emphasis added).

According to Florida's Fifth District,

> We reverse. There is no substantial competent evidence in the record to support liability on the part of the individual defendants to pay the debt of the corporation to whom the goods were supplied . . . . [T]he record is unrefuted that appellee was on notice from the inception of the business relationship that appellants' business was organized and doing business as a corporation. . . .

> Evidence submitted that the shareholders of this closely
> held corporation did not hold formal annual meetings is
> not an adequate basis to pierce the corporate veil.  *See
> Eagle v. Benefield-Chappell, Inc.*, 476 So. 2d 716, 719
> (Fla. 4th DCA 1985).
>
> REVERSED with instructions to enter judgment in favor
> of defendants.

*Schwartz v. Spectratech Ink Co.*, 568 So. 2d 544, 545 (Fla. 5th DCA 1990.

> According to Florida's Third District,

> > We do not believe that any of the above factors either
> > singularly or collectively justify disregarding the
> > corporate entity.  At worst, these factors indicate that
> > Overman operated Hilton in a loose and haphazard manner
> > which certainly would not justify the imposition of
> > personal liability against him.  *See Ally*, 581 So. 2d at 962-
> > 963. Indeed, we do not believe that it is at all unusual for
> > a private, closely-held corporation to have such poor
> > business practices. The more relevant  inquiry, we think,
> > is whether there was evidence that Hilton Oil was either
> > organized for or being utilized as an instrument for
> > fraudulent, illegal or improper purposes.

*Hilton Oil Transp. v. Oil Transp. Co., S.A.*, 659 So. 2d 1141, 1152–53 (Fla. 3d DCA

1995).

In sum, unless the lower court satisfies the strict standard without exception,

Florida's policy is to reverse rulings piercing the corporate veil.  The same standard

applies here because, as stated above, Florida law governs the issue of veil-piercing

in the instant case.

## B. The Findings in the Opinion Satisfy None of the Three Elements for Veil-Piercing Under Florida Law.

### 1. TZ1's Independent Existence

Under the first element, Appellees were required to prove that the "the corporation's independent existence was in fact non-existent," *Lama*, 633 F.3d at 1349. On this point, "even if a corporation is merely an alter ego of its dominant shareholder or shareholders, the corporate veil cannot be pierced so long as the corporation's separate identity was lawfully maintained." *Houri v. Boaziz*, 196 So. 3d 383, 390 (Fla. 3d DCA 2016) (internal marks omitted). The bankruptcy court's opinion fails to satisfy this element. As the opinion itself acknowledges, "TZ1 may have been operated for a legitimate purpose and as an independent entity while it was owned 50/50 by Mr. Hintze and Ethan Fieldman." (Bankr. Doc. 935 at 30.) The opinion then concludes that "once Defendants bought out Mr. Fieldman, everything changed." (*Id.*) It did not change enough, however, to satisfy the strict and exceptional standard under Florida law to prove the company had no independent existence.

According to the opinion, TZ1 had an advisory board or committee, a separate bank account, budget, and various distinct business operations. (*Id.* at 28.) TZ1 further had its own "goodwill, reputation and income," according to the opinion. (*Id.* at 16.) While, according to the opinion, "Ms. Hintze wrote: 'I was unclear and confused by the meeting as TZ is us and we are TZ,'" she said so in the context of

an issue regarding a conflict waiver. Further, common knowledge suggests that it is not unusual for a small business owner to equate herself with her business. This conclusory statement by a layperson does not the satisfy the strict requirements under Florida law to pierce the corporate veil. As one court put it, "we do not believe that it is at all unusual for a private, closely-held corporation to have such poor business practices . . . . Without more, we cannot deem such action . . . to be fraudulent, illegal or improper in nature." *Hilton Oil Transp. v. Oil Transp. Co., S.A.*, 659 So. 2d 1141, 1152–53 (Fla. 3d DCA 1995).

Similarly, the lower court's opinion's statement that "in reality, there was no advisory board. There was a provision for an advisory committee" is of no moment. Florida law excuses instances of far less formality in veil-piercing cases: "Evidence submitted that the shareholders of this closely held corporation did not hold formal annual meetings is not an adequate basis to pierce the corporate veil." *Schwartz v. Spectratech Ink Co.*, 568 So. 2d 544, 545 (Fla. 5th DCA 1990). As another court put it, "At worst, these factors indicate that [defendant] operated [his business] in a loose and haphazard manner which certainly would not justify the imposition of personal liability against him." *Hilton Oil Transp. v. Oil Transp. Co., S.A.*, 659 So. 2d 1141, 1152–53 (Fla. 3d DCA 1995).

Thus, the bankruptcy court's opinion does not establish that TZ1's separate existence vanished at any point in time, and therefore, this required element under Florida law was not met.

### 2.   No Fraudulent or Improper Purpose Under Florida Law

Under the second element, "the corporate form must have been used fraudulently or for an improper purpose," *Lama*, 633 F.3d at 1349.  The bankruptcy seemed troubled by the fact that, according to the opinion, the Hintzes acted "in secret," engaging in a "cover up" in order to "hide the transfer from plaintiffs" and operate "under the radar," with Appellees "being kept in the dark" when the transfer was "purposefully hid."  (Bankr. Doc. 935 at 18 n. 40, 21, 23, 29-30, 34.)

Colorful comments notwithstanding, Florida law has already rejected this "cover up" theory as a basis to pierce the corporate veil.

> A & M's assertion that the formation of 111 Properties was a fraud **and a subterfuge to keep Lassiter from knowing** that it was really Vara purchasing the property is insufficient grounds for piercing the corporate veil of 111 Properties.  **Although it may have been clever, it is not an example of the kind of conduct the supreme court in *Dania Jai-Alai Palace* describes as sufficient to pierce a corporate veil.**

*111 Properties, Inc. v. Lassiter*, 605 So. 2d 123, 125–26 (Fla. 4th DCA 1992) (emphasis added).  Similarly,

> We agree with both the bankruptcy and district courts that [debtor] **Thurman and his associates acted with questionable ethics in effecting the transfer of the**

> **assets. We are unable to conclude, however, that debtor's actions justify the loss of his discharge** or the exception of MBank's debt from the effect of that discharge.

*In re C.A. Thurman*, 901 F.2d 839, 842 (10th Cir. 1990) (emphasis added), *cited in*

*In re Watman*, 458 F.3d 26 (1st Cir. 2006).  Finally, "it does not follow that because

the debtor may have caused his corporation to transfer its assets in fraud of its

creditors, it should also follow that the transfer of property of another entity should

support a denial of the debtor's discharge."  *In re Srour*, 138 B.R. 413, 419–20

(Bankr. S.D.N.Y. 1992).

Further, if the Hintzes engaged in "clever" conduct, it was done in private

with their attorney, without any expectation that their communications would be

dissected and examined in an aggressive adversarial environment by its most

aggressive competitor.  Such an uncensored discussion is presumably common

among counsel and clients, hence the reason for the sacredly held attorney-client

privilege.  The revelation of the Hintzes' private musings aimed at complying with

the law of preferences is not a valid basis for veil-piercing under Florida law.

Even if the "cover up" theory did pass muster under Florida law, which it does

not, the remedy available to Appellees exists under fraudulent transfer law, not under

an extraordinary finding of veil-piercing to shoehorn a denial of discharge under

§ 727(a)(2).  The Florida Supreme Court has spoken directly on point:

> The rule is that the corporate veil will not be pierced, either
> at law or in equity, unless it be shown that the corporation
> was organized or used to mislead creditors or to perpetrate
> a fraud upon them.
>
> . . . .
>
> It may well be that some of the assets of the corporation
> were wrongfully diverted by the Rileys—we find the
> evidence too inadequate to make a finding in this respect.
> But if corporate funds were so diverted the law provides
> several appropriate remedies for their recapture. *See, e.g.,*
> § 55.52-55.61, 62.37, Florida Statutes, 1941.

*Riley v. Fatt*, 47 So. 2d 769, 773 (Fla. 1950).

*Riley* references former Florida Statutes §§ 55.52 and 62.37. These statutes have been renumbered as §§ 56.29 and 68.05. They are Florida's proceeding supplementary and creditors' bill statutes that expressly provide remedies for fraudulent conveyances. *See, e.g.,* § 56.29(9). As another court succinctly put it, "fraudulent transfers of corporate property are not grounds for denial of discharge in an individual's case." *In re Scott*, 462 B.R. 735, 742-43 (D. Alaska 2011).

Thus, even if a "cover up" as expressed in private, attorney-client communications regarding compliance with the law of preferences could trigger liability, the appropriate cause of action, under *Riley*, would be that of a fraudulent conveyance claim, not a claim to pierce the corporate veil in an attempt to satisfy 11 U.S.C. § 727(a)(2).[4]

---

[4] Further, despite the bankruptcy's repeated concerns regarding the Hintzes' strategies regarding preferential transfers under the Bankruptcy Code, such conduct does not constitute bad faith, or fraud, as a matter of law:

The decisive principle in this case is that a mere preference between creditors does not constitute bad faith:

> [E]ven the preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance, whether or not it prejudices other creditors, because "[t]he basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy some of his creditors; it normally does not try to choose among them."

*HBE Leasing I*, 48 F.3d at 634 (quoting *Boston Trading Group, Inc. v. Burnazos*, 835 F.2d 1504, 1509 (1st Cir. 1987)). Nor does it matter that the preferred creditor knows that the debtor is insolvent:

> **[A] conveyance which satisfies an antecedent debt made while the debtor is insolvent is neither fraudulent nor otherwise improper, even if its effect is to prefer one creditor over another.** It is of no significance that the transferee has knowledge of such insolvency. Nor is the transfer subject to attack by reason of knowledge on the part of the transferee that the transferor is preferring him to other creditors, even by virtue of a secret agreement to that effect.

*Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.*, 191 A.D.2d 86, 90–91, 599 N.Y.S.2d 816 (1st Dep't 1993) (internal citations and quotation marks omitted).

*In re Sharp Intern. Corp.*, 403 F.3d 43, 54–55 (2d Cir. 2005) (emphasis added).

### 3.   No Injury to Appellees

Under the third element, "the fraudulent or improper use of the corporate form [must] cause injury to the claimant," *Lama*, 633 F.3d at 1349.  As the bankruptcy court's opinion itself acknowledges, "the focus of veil piercing is the injury to creditors."  (Bankr. Doc. 935 at 32 n. 86.)  Appellees sustained no injury under the facts recited in the opinion.   According to the opinion, regarding the loan to Appellees,

> Maker [Hintze] explicitly agrees that collateral for this loan includes both their personal assets as well as the assets of Tutoringzone, LC.  Maker further agrees that any proceeds from the sale of any Tutoringzone, LC assets exceeding individually or collectively $10,000.00 must first be applied to the Holder's debt and accumulated interest thereon.

(*Id.* at 10.)  In other words, Appellees received a pledge from <u>TZ1</u> in return for a loan to <u>Hintze</u>.  The bankruptcy court found that the IP Transfer caused Appellees' injury because it compromised their "rights" under the pledge above.  As the court put it, "The transfers rendered Plaintiffs' contractual right to receive the proceeds of any sale of the assets of TZ1 in excess of $10,000 a nullity."  (*Id.* at 30.)

To the contrary, TZ1's gratuitous promise to pledge its assets to Appellees, who provided <u>no consideration</u> to TZI, is unenforceable.  *E.g.*, *In re Bayshore Yacht & Tennis Club Condo. Ass'n., Inc.*, 336 B.R. 866, 875 (Bankr. S.D. Fla. 2006) ("A central tenet of contract law is that for a contract to be enforceable, there must be

consideration. 'A mere gratuitous promise of a future gift, lacking consideration, is unenforceable.'" *Kaufman v. Harder*, 354 So. 2d 109, 109 (Fla. 3d DCA 1978)). Without any enforceable right to the assets in the IP Transfer, Appellees could not have been harmed by such transfer. Thus, Appellees' claim fails under this element as well.

Finally, even if TZ1's gratuitous pledge had been enforceable, the facts stated in the opinion show that the IP Transfer caused an injury, if to anyone, only to the creditors of TZ1, not the creditors of the Hintzes. Here, Appellees are creditors of the Hintzes, not TZ1. The creditors of TZ1, in fact, would be harmed by Appellees' enforcement of the gratuitous pledge of TZ1's assets. If Appellees recovered TZ1's assets in return for the loan to Hintze, then far fewer assets would be available to pay creditors of TZ1, which under all accounts was a struggling company. Simply put, Appellees seek to advance their own interests at the expense of the legitimate interests of TZ1's creditors, by asserting a claim to an unenforceable pledge of TZ1's assets. Such an attempted perversion of priorities among creditors does not support a claim of "injury" to Appellees.

## IV. THE HINTZES DID NOT "DESTROY" THEIR MEMBERSHIP INTERESTS IN TZ1.

As an alternative to the veil-piercing theory, the end of the lower court's opinion presents "destruction of property" as another theory to deny a discharge. The Hintzes destroyed their property, the theory goes, by way of the IP Transfer, and

the accompanying reduction in value of their membership interests. This theory fails under the facts presented. First, as the opinion itself notes, TZ1 sold additional property, outside the IP Transfer, and received cash for these sales. (Bankr. Doc. 935 at 7 n.11.) Second, as the opinion notes, TZ1 received at least $75,000 in cash for the lease of the intellectual property to TZ2. (*Id.* at 7.) Finally, and perhaps most important, the bankruptcy court itself authorized a sale of TZ1's assets for $120,000 on March 17, 2016. (Main Bankr. Case No. 12-10462, Doc. 580.)

Under no reasonable understanding of the facts above can one conclude that the Hintzes' membership interests were "destroyed."

## CONCLUSION

For the foregoing reasons, the IP Transfer was not "property of the debtor" under § 727(a)(2), veil-piercing does not apply under Florida law, and the Hintzes did not destroy their membership interests in TZ1 such that the bankruptcy court's alternative basis to deny discharge applies. As a result, this Court should reverse the Amended Judgment below.

Respectfully submitted,

*s/ Jason Baruch*
Jason H. Baruch, Esq.
Florida Bar No. 10280
jason.baruch@hklaw.com
HOLLAND & KNIGHT LLP
100 N. Tampa Street, Suite 4100

Tampa, Florida 33602
Telephone: (813) 227-8500
Fax: (813) 229-0134
*Attorneys for Appellant Hintze*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation under Federal Rule of

Bankruptcy Procedure 8015(a)(7)(B).  The number of words in this brief is 8,144.

*/s/ Jason Baruch*
Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on May 2, 2017, I caused a copy of the foregoing to be furnished electronically through the Court's CM/ECF electronic notification system to:

Robert Wilcox, Esq. (rw@wlflaw.com)
Elizabeth R.P. Bowen (eb@wlflaw.com)
814 North Hwy. A1A, Suite 202
Ponte Vedra Beach, FL 32082

*/s/ Jason Baruch*
Attorney