## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

**In Re**
**MATTHEW BRUCE HINTZE**
**And LARINA K HINTZE**

     **Debtors.**

   _____/

**MATTHEW BRUCE HINTZE**
**And LARINA K HINTZE**

     **Appellants**

**v.**                                  **CASE NO. 1:17cv18-MCR/GRJ**
                                             **[Lead Case]**

**JOHN SPENCE, et al.,**

     **Appellees.**

_____/

**MATTHEW BRUCE HINTZE**
**And LARINA K HINTZE**

     **Appellants**

**v.**                                  **CASE NO. 1:17cv101-MCR/GRJ**
                                             **[Member Case]**

**THERESA M. BENDER,**

     **Appellee.**

_____/

## ORDER

In this consolidated appeal, the Appellants, Matthew Bruce Hintze and Larina K. Hintze ("the Hintzes"), challenge the Bankruptcy Court's final decision denying a discharge in their Chapter 7 bankruptcy proceeding. *See Spence v. Hintze* (*In re Matthew Bruce Hintze and Larina Hintze*), 570 B.R. 369 (Bankr. N.D. Fla. 2017).[1] The appeal is fully briefed and the Court has heard the parties' oral arguments.[2] Now, having fully considered the matter, the Court affirms.

## I.     Background

### A.     Procedural History

The Hintzes filed a Chapter 7 bankruptcy petition on November 1, 2012.  On May 31, 2013, a group of creditors, John and Sheila Spence, Intermed Biomedical Services, Inc., David Whitney, and FLH Holdings of Florida, LLC ("Investor Creditors") filed a multi-count adversary proceeding against the Hintzes, objecting to the dischargeability of their debts on various grounds.[3]  Relevant to this appeal is

---

[1] The main bankruptcy proceeding is Case No. 12-10462-KKS (Bankr. N.D. Fla.), and the Adversary Proceeding is Case No. 13-01007-KKS (Bankr. N.D. Fla.).

[2] The Trustee elected not to participate in briefing or oral argument, representing that her appeal will rise or fall with the Court's decision on the Bankruptcy Court's ruling in the appeal related to the adversary proceeding.

[3] Counts I through VII consist of each Investor Creditor's separate objection to discharge on grounds that the money was obtained by fraud under 11 U.S.C. § 523(a)(2)(A), (B); in Count VIII, all Investor Creditors objected to discharge under 11 U.S.C. § 727(a)(2)(A), asserting a

Count VIII of the adversary complaint, in which the Investor Creditors objected to discharge on grounds that the Hintzes, acting "with intent to hinder, delay or defraud" the Investor Creditors, had transferred or destroyed "property of the debtor, within one year before the date of the filing of the petition." 11 U.S.C. § 727(a)(2)(A). The Investor Creditors elected to proceed with a bench trial on this count. The Bankruptcy Court granted the objection and denied the discharge. The Hintzes appeal.

### B.   Bankruptcy Court's Fact Findings

The Bankruptcy Court found the following facts.[4] The Hintzes' main asset was a 100% membership interest in in an entity known as TutoringZone, LLC ("TZ1"). TZ1 began operating as a tutoring business for college students in Gainesville, Florida, in 2003, and became very successful in the following years, with gross revenues exceeding $1.6 million by 2010. From 2006 through 2011, Matthew Hintze and a business partner, Ethan Fieldman, each owned 50% of TZ1.

---

transfer of property of the debtors with intent to hinder or delay creditors; and in Count IX, all Investor Creditors objected under § 727(a)(5), asserting the Hintzes had failed to explain a loss of assets.

[4] The Court will provide a summary of the Bankruptcy Court's findings, which are stated in full at *Spence v. Hintze (In re Matthew Bruce Hintze and Larina Hintze),* 570 B.R. 369 (Bankr. N.D. Fla. 2017). Importantly, the Hintzes do not challenge the facts found by the Bankruptcy Court. Instead, their arguments assume these facts as true and maintain that the resulting legal conclusions are in error.

CASE NO. 1:17cv18-MCR/GRJ [Lead Case]
CASE NO. 1:17cv101-MCR/GRJ [Member case]

When Hintze and Fieldman had a falling out, Hintze filed suit in state court to dissolve TZ1, and a liquidating auction sale was held on sealed bids. Hintze offered the winning bid and was awarded the right to purchase Fieldman's membership interest for $835,000. However, the Hintzes did not have all of the money and ended up borrowing approximately $443,578.08 total in personal loans of varying amounts from the Investor Creditors (Appellees).[5] The loans were executed as unsecured promissory notes, but three of the four notes included a provision pledging the Hintzes' personal property as well as the assets of TutoringZone as collateral and requiring that the proceeds from any sale of TZ1's assets exceeding $10,000 be applied first to pay off the note.

The Hintzes did not obtain a non-compete agreement from Fieldman as part of the purchase, and not long after June 17, 2011, the date of the buyout, Fieldman started a successful competing tutoring business in Gainesville called "Study Edge," which caused TZ1 to lose money. By 2012, the Hintzes needed more investments to keep the company afloat but were unsuccessful in borrowing any more money from the Investor Creditors. Thus, they turned to a friend, Christopher James, with

---

[5] The Hintzes admitted owing the Investor Creditors a total of $443,578.08 in unsecured loans as of November 1, 2012.

CASE NO. 1:17cv18-MCR/GRJ [Lead Case]
CASE NO. 1:17cv101-MCR/GRJ [Member case]

whom they had prior dealings and prior debts.[6]  Instead of James loaning the Hintzes more money, they devised a plan in which James would start a new company called TutoringZone II, Inc. ("TZ2").[7]  They arranged a series of transactions through which the Hintzes would transfer most of TZ1's assets to TZ2 and allow TZ1 to fail, with TZ2 carrying on the business.

On May 22, 2012, the parties first executed an intellectual property lease between TZ1 as Lessor (Mr. Hintze signing as President and Managing Member) and James as Lessee.[8]  The lease required James to pay approximately $75,000 for the initial lease period.  James paid TZ1 in $25,000 installments, which were used for payroll.  James also advanced $25,000 for Mr. Hintze's salary before he signed with TZ2.

On June 4, 2012, TZ1 executed an intellectual property transfer of the same assets to TZ2, with James signing as the Organizer and Managing Member of TZ2.[9]

---

[6] James is a professor of Finance at the University of Florida in Gainesville and a friend of Mr. Hintze.  The Hintzes already owed him $475,000 on two promissory notes from an unrelated business deal in 2010.

[7] TZ2 was owned 90% by James and 10% by his assistant, Cynthia Frenchman.  The Hintzes and all the tutors eventually signed as employees of TZ2.

[8] Frenchman also signed as lessee.

[9] James, the Hintzes, and TZ1 were all represented by the same attorney who drafted all of the documents and also later filed the Hintzes' bankruptcy petition.  That attorney no longer

In effect, the Hintzes conveyed all of TZ1's valuable assets to TZ2, including exams and exam preparatory materials, instructional materials, graphics and logos developed by TZ1, desks, and computer software.  The remaining assets of TZ1 consisted of about 500-600 chairs, which were sold for a few thousand dollars cash on Craigslist.  *In re Hintze*, 570 B.R. at 375 n.11.  TZ1 received no monetary payment for the transfer of its assets to TZ2.  Instead, as consideration, James released the Hintzes from $200,000 of their personal debt to him.  According to Matthew Hintze, he informed the Investor Creditors of his intent to transfer these assets to a new company to be owned by James at meeting held on May 14, 2012, but the Investor Creditors deny that they were told anything about it, and there are no recorded minutes. The record reflects that after that meeting, the Investor Creditors continued requesting accurate financial information about TZ1, yet their requests went unanswered as the Hintzes and their attorney found ways to delay disclosing the transfer of assets to TZ2.  Despite the June 4, 2012 transfer of intellectual property and other assets, TZ2 was not formally created until July 2012. TZ2 used the same business name as TZ1, "TutoringZone;" maintained the same

---

represents them in this matter, and during the bankruptcy proceedings, the Hintzes waived their attorney-client privilege as to communications with him.

telephone numbers, address, advertising, and logos; and used the same materials and employees as TZ1.  Thus, by outward appearance to the Investor Creditors and the public, there was no indication of a change in the business.

The Bankruptcy Court found that the email correspondence between the Hintzes, James, and their attorneys demonstrated a purposeful failure to disclose the planned transfer to the Investor Creditors until after the Hintzes had filed their bankruptcy petition.  Beginning in March 2012, they first described various ways to save the TZ1 business through filing for bankruptcy and transferring assets, possibly to their competitor Feldman or a new company.  These conversations excluded the Investor Creditors.  In May 2012, they discussed a "pump and dump" strategy, which involved TZ1 selling its intellectual property to a new holding company, and they cautioned each other about being careful in communications in order to complete the deal before any creditors filed a lawsuit.  Ms. Hintze had spoken to a different attorney in May 2012, who advised that the transaction could open them up to claims of fraud, which she reported to the others.

On May 29, 2012, Mr. Hintze responded by email to John Spence, declaring that they were "allowing TZ1 to go out of business" and were "working hard to move forward and revive the business in a different way with the goal to pay everyone

back." *In re Hintze*, 570 B.R. at 382. The Bankruptcy Court noted that the email made no mention of an entity named TZ2, that TZ2 would be owned by the Hintzes' friend James, that the Hintzes intended to transfer all of TZ1's valuable assets to TZ2 for no consideration to TZ1, or that TZ2 would continue the same business "with Mr. Hintze at the helm." *Id.* Additional emails throughout June and July 2012 also show purposeful delay in that they failed to inform creditors of the true state of affairs, failed to respond to inquiries from creditors about TZ1's financial condition, and advised each other to conceal the intellectual property asset transfer, in order "to keep them from knowing for 90 days."[10]  ECF No. 3-66, at 115 (June 30, 2012 email). In an email dated July 5, 2012, Ms. Hintze expressly thanked her attorney for "keeping the ball moving with no goal other than to delay" by not disclosing that TZ1 was defunct to their competitor, Fieldman, whose company, Study Edge, was discussing making an offer to purchase TZ1.[11]  *In re Hintze,* 570 B.R. at 383; ECF

---

[10] In bankruptcy, a preferential transfer to one creditor within 90 days of the filing of the bankruptcy petition can be set aside and the asset reclaimed to the bankruptcy estate for the benefit of all creditors if the debtor was insolvent at the time. *See* 11 U.S.C. § 547(b). The Hintzes and their attorney were plainly aware of this provision and attempted to evade it by not disclosing the transfer until such time when the transfer was outside of that period. They filed for bankruptcy protection approximately 150 days after the TZ1 asset transfer.

[11] Emails also indicate that Fieldman's father had purchased one creditor's promissory note, and the Hintzes feared he would take aggressive action against TZ1 by enforcing the note and executing on the Hintzes' ownership interest in TZ1, effectively benefitting Fieldman and Study Edge. Ms. Hintze indicated that their "strategy could be to make it seem like this is the

No. 3-66, at 178.  Also, in an email from Mrs. Hintze to James about a meeting with their attorney, she stated:  "I was unclear and confused by the meeting as TZ is us and we are TZ—first he [the attorney] said he only represents TZ—then he said we are so mingled he would waive conflict and represent us."  *In re Hintze,* 570 B.R. at 385.  The Bankruptcy Court also noted that even James admitted his involvement was for the purpose of sheltering TZ1 from creditors and helping Mr. Hintze.  *Id.* at 384.

At the time of the asset transfer to TZ2, the Hintzes' membership in TZ1 was their only asset of value, aside from an exempt homestead.  The Bankruptcy Court found that the transfer "rendered TZ1 insolvent and the [Hintzes'] membership interests in TZ1 worthless," *id.* at 376, but "the charade that TZ1 remained in business continued until the [Hintzes] filed their bankruptcy petition," *id.* at 375.  The evidence shows that before the asset transfer, the Hintzes had valued TZ1 as worth anywhere between $350,000 and $3 million.[12]  Also, only one year earlier, the

---

worst thing in the world for us and to make every effort to attempt to negotiate to avoid this so they keep their eye on that ball."  ECF No. 3-36, at 54.  This shows an intent to negotiate with Fieldman for the sole purpose of continuing to delay the disclosure of the asset transfer and the creation of TZ2.

[12] Although Mr. Hintze testified that TZ1 actually had no value at the time of the transfer, the Bankruptcy Court found this was not credible in light of his prior statements.  The court also noted that if TZ1's assets really had a zero value *before* the transfer, as the Hintzes contended, it

Hintzes had purchased Fieldman's 50% interest for $835,000, but in their bankruptcy schedules, filed five months after the asset transfer, they claimed that their 100% interest in TZ1 was worth only $100. *In re Hintze*, Case No. 1:17cv101-MCR/GRJ, ECF No. 3-2, at 13 (N.D. Fla). In sum, the Bankruptcy Court found that the Hintzes had caused the transfer of TZ1's valuable assets to a company formed by a friend without disclosing the transfer to the Investor Creditors and for no consideration to TZ1, despite owing the Investor Creditors significant sums of money and despite provisions in their notes that required payment to them first from the proceeds of any sale of TZ1's assets exceeding $10,000. The court also noted that TZ2 remains profitable, continuing the same business under the same name and under Mr. Hintze's direction.

## C.    Bankruptcy Court's Analysis

The Investor Creditors' objection to discharge was based on 11 U.S.C. § 727(a)(2)(A), which requires proof that a debtor transferred or destroyed property of the debtor with intent to hinder or delay creditors and did so within one year before the date of filing bankruptcy. *See Jennings v. Maxfield* (*In re Jennings*), 533 F.3d

---

would have made no sense for James to want to continue doing business under the same name and using the same materials and to forgive a portion of their debt.

CASE NO. 1:17cv18-MCR/GRJ [Lead Case]
CASE NO. 1:17cv101-MCR/GRJ [Member case]

1333, 1338-39 (11th Cir. 2008) (burden of proof is on the party objecting to discharge).  The Bankruptcy Court found that the Investor Creditors had met their burden.  The court found no dispute both that the intellectual property asset transfer occurred within one year of the Hintzes' bankruptcy filing and that the Hintzes had orchestrated the intellectual property transfer.  Based on the record presented, the Bankruptcy Court found that the Hintzes had an actual intent to hinder, delay or defraud.  In making this finding, the court cited several badges of fraud:  (1) the lack of or inadequacy of consideration received by TZ1 for the intellectual property asset transfer—although the Hintzes received forgiveness of $200,000 in personal debt, TZ1 received nothing; (2) the nature of the relationship, i.e., that transferor TZ1 was the Hintzes' alter ego and the transferee (TZ2) was owned by the Hintzes' friend, James; (3) that the transfer rendered TZ1 insolvent; (4) that the cumulative effect of the transaction eviscerated the Hintzes' ability to pay the Investor Creditors, leaving the Investor Creditors no effective remedy; and (5) the general timing and chronology revealed that the transfer occurred after the Hintzes realized they could not repay the Investor Creditors.  The Bankruptcy Court recounted in detail the 2012 email correspondence between the Hintzes, their attorney, and James in support of these findings.

CASE NO. 1:17cv18-MCR/GRJ [Lead Case]
CASE NO. 1:17cv101-MCR/GRJ [Member case]

Finally, the Bankruptcy Court determined that the Hintzes had "transferred" and "destroyed" "property of the debtors" within the meaning of § 727(a)(2)(A). The Bankruptcy Court first found that TZ1 and the Hintzes are one and the same under an alter ego analysis and thus the transfer of TZ1 assets was a transfer of "property of the debtors" within the meaning of the statute. *See In re Hintze*, 570 B.R. at 384-85. Specifically, the court found the three elements necessary to pierce the corporate veil under Florida law: (1) the Hintzes dominated TZ1 to such an extent that it had no independent existence, (2) used TZ1 for a fraudulent purpose of defrauding creditors, and (3) thereby caused injury to the Investor Creditors. *See id.* at 384-87 (citing *In re Pearlman*, 462 B.R. 849, 856 (Bankr. M.D. Fla. 2012), and *Dania Jai-Alai Palace Inc. v. Sykes*, 450 So. 2d 114, 1120 (Fla. 1984)). On finding that the facts justified piercing the corporate veil, it was determined that the asset transfer "transferred" "property of the debtor." Alternatively, the Bankruptcy Court determined that the Hintzes had "destroyed" "property of the debtor" by destroying the value of their sole membership interest in TZ1. *Id.* at 389.

Therefore, the Bankruptcy Court denied the debtors a discharge under § 727(a)(2)(A). The Hintzes appeal.

## II.   Discussion

The Court has jurisdiction over an appeal from a final order of the Bankruptcy Court.  *See* 28 U.S.C. § 158(a)(1).  In resolving a bankruptcy appeal, the district court reviews the fact findings of the Bankruptcy Court for clear error and its legal conclusions *de novo*.  *Coady v. D.A.N. Jt. Venture III, V.P.* (*In re Coady*), 588 F.3d 1312, 1315 (11th Cir. 2009).  Generally, "[t]he Bankruptcy Code favors discharge," *id.*, consistent with bankruptcy's goal of providing a "fresh start" to the debtor. *Bernstein v. Carl Zeiss, Inc.* (*In re Bernstein*), 78 B.R. 619, 622 (S.D. Fla. 1987). To promote the policy of providing debtors a fresh start, and because denial of discharge is a drastic and harsh remedy, statutory provisions denying discharge should be liberally construed in favor of debtors and strictly construed against objections.  *Caterpillar, Inc. v. Gonzalez (In re Gonzalez)*, 302 B.R. 745, 751 (Bankr. S.D. Fla. 2003).  That said, discharges are for honest debtors, and the policy of construing statutory provisions that deny discharge "liberally in favor of the debtor and strictly against the creditor[,] applies only to the honest debtor."  *In re Coady*, 588 F.3d at 1315 (quoting *Jennings*, 533 F.3d at 1338-39).

Under Section 727(a), the bankruptcy court must grant a discharge unless one of several enumerated exceptions is met, including that:

CASE NO. 1:17cv18-MCR/GRJ [Lead Case]
CASE NO. 1:17cv101-MCR/GRJ [Member case]

(2)  the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed--

    (A)  property of the debtor, within one year before the date of the filing of the petition[.]

    * * *

11 U.S.C. § 727(a)(2)(A).[13]  To succeed in challenging a discharge under § 727(a)(2)(A), the creditor must establish:

(1) an act within one year before the bankruptcy petition was filed,

(2) done with actual intent to hinder, delay, or defraud a creditor,

(3) by the debtor, and

(4) "that the act consisted of transferring, removing, destroying, or concealing any of the debtor's property."

*Jennings*, 533 F.3d at 1339 (citing § 727(a)(2)(A)).  By its express terms, this provision "is intended to prevent the discharge of a debtor who attempts to avoid payment to creditors by concealing or otherwise disposing of assets." *RES-GA Diamond Meadows, LLC v. Robertson (In re Robertson)*, 576 B.R. 684, 700 (Bankr.

---

[13]  While the statute lists several other circumstances that qualify as an exception, subsection (a)(2)(A) is the only provision at issue in this appeal.

N.D. Ga. 2017) (quoting 6 Collier on Bankruptcy ¶ 727.02[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. Supp. 2013)).

Preliminarily, as determined by the Bankruptcy Court, the Court notes that the first and third *Jennings* factors are not at issue because there is no dispute that the intellectual property asset transfer occurred within one year before the bankruptcy petition (the first factor), and the Hintzes orchestrated the transaction (the third factor).

The second *Jennings* factor requires an intent to hinder, delay, or defraud a creditor. *Jennings*, 533 F.3d at 1339. This presents a question of fact, which the Court reviews for clear error. *Wine v. Wine (In re Wines),* 997 F.2d 852, 856 (11th Cir. 1993). A finding of an intent to hinder, delay or defraud can be based on circumstantial evidence of fraud. *See Dione v. Keating (In re XYZ Options, Inc.),* 154 F.3d 1262, 1271-72 (11th Cir. 1998) (setting out several badges of fraud from which an intent to defraud can be inferred). As noted above, the Bankruptcy Court identified in detail several badges of fraud and found them sufficient to demonstrate an actual intent to hinder, delay, or defraud creditors. *Brown v. Luboff (In re Sigma-Tech Sales, Inc.)*, 570 B.R. 408, 415 (Bankr. S.D. Fla. 2017) ("While a single badge

of fraud may amount only to a suspicious circumstance, a combination of badges

will justify a finding of fraud.").

The Hintzes do not challenge the Bankruptcy Court's fact findings in this

appeal.[14]  Instead, they argue that, assuming the facts found by the Bankruptcy Court

as true, the legal conclusions were in error.  Therefore, only the fourth *Jennings*

factor is at issue.

---

[14] Despite making no argument that the facts represent clear error and in fact representing
affirmatively that the facts are accepted, the Hintzes nonetheless intimate that they disagree with
some of the inferences that the Bankruptcy Court drew from the facts.  For instance, they state that
the emails referencing the 90-day period actually show that they paid careful attention to the
requirements of federal law, not that they intended to disregard them or defraud their creditors.
They also contend that the "pump and dump" strategy discussed in some emails was not an
accurate use of the concept, that is, technically, no actual "pump and dump occurred" as that term
is ordinarily used. However, the Bankruptcy Court did not find that a pump and dump scheme
occurred; instead, the court recited the content of relevant emails to show that there was an actual
intent to hinder, delay or defraud the Investor Creditors, who were not included in these
discussions.  The Hintzes take no issue with the historical facts and cannot claim clear error in the
inferences drawn.  Even if they did, the Court finds no clear error.  It is the duty of the fact finder
to draw inferences from the evidence, and "[b]ecause a determination concerning fraudulent intent
depends largely upon an assessment of the credibility and demeanor of the debtor, deference to the
bankruptcy court's factual findings is particularly appropriate." *In re Phillips*, 476 F. App'x 813,
816 (11th Cir.  2012) (quoting *In re Miller*, 39 F.3d 301, 305 (11th Cir. 1994)).  This Court will
not reverse a bankruptcy court's factual inferences even if a contrary inference could have been
drawn where no clear error argument is raised; a review of the record demonstrates that there is
evidence to support the decision; and, the Court is not left with a firm conviction that a mistake
has been made.  *See United States v. Tejas,* 868 F.3d 1242, 1244 (11th Cir. 2017); *In re TOUSA,
Inc.,* 680 F.3d 1298, 1310 (11th Cir. 2012).

The fourth *Jennings* factor requires proof that the debtor's "act consisted of transferring, removing, destroying, or concealing any of the debtor's property."[15] *Jennings*, 533 F.3d at 1339.  The Bankruptcy Court found that the Hintzes had satisfied this factor in two separate ways: (1) by "transferring" "property of the debtor," and (2) by "destroying" "property of the debtor" through the asset transfer that left TZ1 a shell corporation, consequently gutting the value of the Hintzes' only valuable non-exempt asset, their 100% membership interest in TZ1.  The Hintzes argue that both conclusions are in error.  Either ground, if established, is a sufficient basis to affirm.

## A.  Destruction of the LLC Membership Interest—Property of the Debtor

The Court begins with the Hintzes' membership interest in TZ1 because there is no dispute that the Hintzes *directly* owned this asset, and it represented 100% ownership of the company, TZ1.  The Hintzes argue that, although the transfer of corporate property diminished the value of the membership interest, it was not "destroyed" under the plain language of § 727(a)(2)(A).  The Court disagrees.

---

[15] As already noted, the Court reviews the Bankruptcy Court's legal conclusions *de novo*. *Coady*, 588 F.3d at 1315.

CASE NO. 1:17cv18-MCR/GRJ [Lead Case]
CASE NO. 1:17cv101-MCR/GRJ [Member case]

As the Bankruptcy Court noted, and this Court confirms, there is a paucity of case law interpreting the term "destroy" for purposes of § 727(a)(2)(A). The Bankruptcy Court recited the ordinary dictionary definition of the term, which means "to ruin the structure, organic existence, or condition of." *In re Hintze*, 570 B.R. at 387 & n.89 (quoting http://www.merriam-webster.com/dictionary/destroy). The Bankruptcy Court aptly observed that if a reputation can be "destroyed," "then it stands to reason that one can destroy the value of a membership interest in an LLC." *Id.* at 388. The undersigned agrees with this reasoning.

The facts as found by the Bankruptcy Court include that Mr. Hintze had estimated the worth of the company at $2,520,000 only six days before the transfer and that TZ1 was reduced to a shell corporation after the transfer of intellectual property assets, retaining a value of only $100, according to the Hintzes' own bankruptcy schedules, at the time they filed the bankruptcy petition. According to the Bankruptcy Court, this substantial reduction in value effectively destroyed the value of the membership interest. Although the Hintzes do not challenge any fact finding as clearly erroneous, they argue that even $100 is *some* value. They further reference facts showing that some assets were retained by the company and sold for cash, that the Intellectual Property Lease brought in $75,000, and that the Trustee

auctioned the TZ1 membership interest for $120,000 during this bankruptcy proceeding, which they contend demonstrates that the membership retained value and was not destroyed.[16]

The Court finds the facts referenced by the Hintzes unavailing. The assets remaining after the intellectual property and asset transfer amounted to 500-600 chairs, which sold for a few thousand dollars. The intellectual property lease was executed *before* the asset transfer, and although it brought some cash into the company, it was needed and used for payroll until the employees signed contracts with TZ2. There is no evidence of a value greater than $100 at the time the

---

[16] The Investor Creditors urge the Court not to consider the auction price because it is not part of the record on appeal. The Court finds it appropriate to take judicial notice of this fact and the record of the main bankruptcy proceedings, regardless of whether it was made part of the record in this appeal. First, the Trustee's appeal has been consolidated with this adversary appeal, and the Trustee included the Order Approving Report and Trustee's Intention to Sell Property of the Estate by Private Sale, which referenced the $120,000 sale price, in the designated record of that member case. *See* Member Case No. 1:17cv101-MCR/GRJ, ECF No. 3-5. Also, the Court has already considered the record in a related appeal arising out of this bankruptcy proceeding brought by Christopher James against the Investor Creditors and the Trustee, in which the sale and surrounding circumstances were relevant. *See James v. FLH Holdings of Fla., LLC (In re Hintze),* Case No. 3:16cv333-MCR/GRJ, ECF No. 37 (N.D. Fla. Aug. 11, 2017) (affirming the Bankruptcy Court's rulings that there was no violation of the automatic stay and, in part, finding that the Trustee had abandoned her exclusive right to avoid the transfer of assets by selling the estate's interest in the membership). The Court takes judicial notice of its own public docket and prior decision in this bankruptcy proceeding because the facts are not subject to reasonable dispute. *See* Fed. R. Civ. P. 201(b); *see Horne v. Potter*, 392 F. App'x. 800, 802 (11th Cir. 2010) (unpublished) (affirming district court's taking of judicial notice of public records in a prior case that were not subject to reasonable dispute).

CASE NO. 1:17cv18-MCR/GRJ [Lead Case]
CASE NO. 1:17cv101-MCR/GRJ [Member case]

bankruptcy petition was filed, and the Court finds this is sufficient to find that the value of the membership, previously estimated in worth between $350,000 and $3 million, had been effectively "destroyed."   The Court finds no reason to read "destroy" so literally as to require physical destruction.

The Court also disagrees with the Hintzes' contention that the sale of the membership during the bankruptcy proceedings demonstrates that the membership was not "destroyed" by their fraudulent conduct.   The Trustee auctioned the membership during the bankruptcy proceedings, and it sold for $120,000.   The record is clear, however, that this value lay in the litigation rights that were simultaneously transferred with the membership interest, because the Trustee decided not to pursue a fraudulent transfer action.[17]   The Hintzes contended at oral argument that the membership was not destroyed because it had "an asset, a cause of action, . . . that was worth six figures."   However, they cannot defeat the finding that they destroyed the value of their membership interest through fraud by claiming

---

[17] The record reflects that the Trustee sold the membership together with the standing to bring suit for fraudulent transfer of the corporation's valuable assets, abandoning the Trustee's fraudulent transfer claim.   The high bidder was TZ Acquisitions, a company owned by Fieldman, TZ1's competitor, and the second highest bidder was James ($45,000), who owns TZ2 and against whom a fraudulent transfer action could have been asserted by the owner of the TZ1 membership. Thus, both of the high bidders had much to gain by obtaining the rights to a fraudulent transfer cause of action, which explains the high auction price for the membership interest.

CASE NO. 1:17cv18-MCR/GRJ [Lead Case]
CASE NO. 1:17cv101-MCR/GRJ [Member case]

that their own fraudulent conduct *added* value to the membership by creating litigation rights based on that fraud.  This argument would turn the equitable nature of the bankruptcy proceeding on its head.  *Cf. Shapiro v. Gherman (In re Gherman)*, 103 B.R. 326, 331 (Bankr. S.D. Fla. 1989) ("I refuse to read § 727(a)(2) so literally as to deny discharge to an honest debtor while granting discharge to a thief.").

The auction price of the membership during the bankruptcy proceedings in no way reflects that TZ1 was no longer a shell corporation or that it wasn't a shell corporation at the time the bankruptcy petition was filed.  TZ1's entire business involved tutoring students using the instructional materials and instructional software that the Hintzes transferred to TZ2, leaving TZ1 a shell corporation without the capability to carry on that business.  The Bankruptcy Court noted that the business was continuing successfully as TZ2, using TZ1's former assets.  The Court agrees with the Bankruptcy Court's determination that, under the plain language of § 727(a)(2)(A), the asset transfer orchestrated by the Hintzes effectively "destroyed" the value of their sole asset, the 100% ownership interest in TZ1.[18]  Thus, the Bankruptcy Court will be affirmed on this ground.

---

[18] The Hintzes argue in their reply brief that the *LLC membership interest* was not "property of the debtor" under § 727(a)(2)(A), citing *Briggs v. Hamrick (In re Hamrick)*, Adv. Pro. No. 15-3033, 2016 Bankr. LEXIS 1986 (Bankr. N.D. Ohio, May 11, 2016) (rejecting a shareholder "destruction of stock" value argument under § 727(a)(2) as an "end run" around the principle that

## B.    Transfer of Corporate Assets:  Alter Ego Theory

The Hintzes also argue that the Bankruptcy Court erred in using an alter ego theory to find that the transfer of TZ1's intellectual property was a transfer of "property of the debtor," as required under § 727(a)(2)(A).  They argue that direct ownership, as opposed to a derivative shareholder's ownership interest, is required for an asset to be "property of the debtor."[19]  In support of the argument, the Hintzes

---

"property of the debtor" does not include a shareholder's derivative interest in corporate assets that has only an incidental impact on stock value).  This argument was raised as to the LLC membership on appeal for the first time in a reply brief.  Thus, the Court declines to address it.  *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 683 (11th Cir. 2014) (collecting cases declining to consider arguments raised for the first time in reply).  Moreover, alternatively, even if the argument had been properly raised, *Briggs* is distinguishable on its facts and thus not persuasive.  The impact of the TZ1 asset transfer on the Hintzes' membership interest cannot be characterized as "incidental."

[19] The Investor Creditors contend that the Hintzes waived this issue by not arguing to the Bankruptcy Court that their derivative ownership of TZ1 was insufficient for the intellectual property transfer to be considered "property of the debtor."  The record reflects, however, that the Hintzes clearly raised the derivative vs. direct ownership issue regarding the intellectual property asset transfer in opposition to the Investor Creditors' motion for summary judgment on Count VIII, filed before trial.  *See* Adv. Proc.13-01007-KKS, ECF No. 778 (Hintzes' opposition to motion for summary judgment on Count VIII arguing derivative vs. direct ownership).  Although the Investor Creditors are correct that the issue was not raised again in the Hintzes' written closing argument filed in late July 2016, after the May 2016 trial, the record reflects that at the time they submitted the written closing arguments in July 2016, the summary judgment motion was also still under advisement and was not ruled on until September 22, 2016.  ECF 3-18.  The decision on the objection to discharge was announced in open court on October 6, 2016, and the written ruling was filed in January 2017 and amended on February 9, 2017.  Therefore, the Court will address the derivative vs direct ownership argument with regard to the asset transfer, which the Hintzes raised in their initial brief on appeal.  *See generally*, *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992) (although refusing to consider one claim that was not raised in the court below, the Court considered another argument pertaining to a claim that had been litigated below, explaining, "[o]nce a federal claim [has been] properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below"); *Pugliese v. Pukka*

cite cases applying the basic principle that an individual shareholder does not own the corporation's assets.  These cases have found that the transfer of corporate assets, even to defraud the corporation's creditors, is not a transfer of the *shareholder's/debtor's* property under § 727(a)(2)(A).   *See MCORP Mgm't Solutions, Inc. v. Thurman (In re Thurman)*, 901 F.2d 839, 841 (10th Cir. 1990) ("The words: 'Property of the debtor,' are not the same as 'property in which the debtor has a derivative interest.' To the contrary, the language of the statute is sufficiently circumscriptive to eliminate such an interpretation."); *NE Neb. Economic Dev. Distr. v. Wagner (In re Wagner)*, 305 B.R. 472, 475 (B.A.P. 8th Cir. 2004) (noting "the debtor must have more than a mere derivative interest in the property in question because the term 'property of the debtor,' as expressed in 11 U.S.C. § 727(a)(2)(A), has reference to property in which the debtor has a direct proprietary interest"); *CIT Group v. Srour (In re Srour)*, 138 B.R. 413, 419-20 (Bankr. S.D.N.Y. 1992) (stating a denial of discharge "does not follow" simply from a debtor "caus[ing] his corporation to transfer its assets in fraud of [the corporation's]

---

*Dev., Inc.*, 550 F.3d 1299, 1304 n.3 (11th Cir. 2008) (considering references to legislative history and prior regulations presented for the first time on appeal as "more accurately characterized as new arguments, rather than new issues").

creditors . . . where the debtor is not charged with having fraudulently transferred any of his own property").

The Court does not take issue with these authorities.  Ownership of shares in a company is not the same as ownership of the corporation's assets.[20]  *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003).  However, the Hintzes' reliance on this basic principle misses the mark in this instance.  None of the cases cited by the Hintzes above or in Part I of the Appellants' Brief in support of the proposition that direct, as opposed to derivative, ownership is necessary to find "property of the debtor" includes any discussion of alter ego or piercing the corporate veil principles, which was the basis of the Bankruptcy Court's decision. The Bankruptcy Court determined that the corporate form was not respected and instead was used by the individual debtors to defraud their creditors.   Therefore, the Hintzes' argument on this ground simply fails to address the heart of the issue.

The Hintzes further argue use of the alter ego theory is a disfavored means of finding "property of the debtor" under § 727(a)(2), and there is scant authority for

---

[20] "It is black-letter law that a corporation is a 'separate entity, a legal being having an existence separate and distinct from that of its owners.'"  *Lort v. Ferguson Enters. (In re Lort)*, 347 B.R. 909, 910 (M.D. Fla. 2006) (quoting *Krivo Indus. Supply Co. v. National Distillers & Chem. Corp.*, 483 F.2d 1098, 1102 (5th Cir. 1973) (under *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), case law of the former Fifth Circuit developed before October 1, 1981, is adopted as precedent in this Circuit).

denying a discharge on this theory.  The Hintzes argue that the few federal cases that have applied the theory in this context require "egregious" facts involving criminal conduct, citing *Miller v. Scott (In re Scott)*, 462 B.R. 735, 743 (Bankr. D. Alaska 2011) (finding a denial of discharge based on alter ego was "an exception to the majority rule").  They also argue that Florida law applies a "strict standard" when evaluating such claims, *Seminole Boatyard, Inc. v. Christoph*, 715 So. 2d 987, 990 (Fla. 4th DCA 1998), and will impose liability by piercing a corporate veil only in the "most extraordinary cases," *PaeTec Commc's, Inc. v. Bull (In re Bull)*, 528 B.R. 473, 487 (M.D. Fla. 2015).  The Investor Creditors contend, to the contrary, that use of an alter ego theory to pierce the corporate veil is well substantiated in denial of discharge cases, that state law provides the relevant analysis, and that the Bankruptcy Court did not err in applying the theory in this case.  The Court agrees with the Investor Creditors, and, for reasons that follow, finds no error in the Bankruptcy Court's denial of discharge on this ground.

First, although the Eleventh Circuit has not directly spoken on the issue, there are numerous federal cases discussing the alter ego theory and corporate veil piercing in the bankruptcy context of determining whether corporate property actually is "property of the debtor" under § 727(a)(2).  *See, e.g., Serio v. DiLoreto*

*(In re DiLoreto)*, 266 F. App'x 140 (3d Cir. 2008) (unpublished) (denial of discharge

under § 727(a)(2) affirmed on a reverse-piercing analysis where debtor was found

to have used corporations to conceal assets from his creditors); *In re Blatstein*, 192

F.3d 88 (3d Cir. 1999) (declining to reverse-pierce corporate veil, applying

Pennsylvania law, where it was not justified by the facts; the corporate form had

been respected); *In re Scott*, 462 B.R. at 743 (finding alter ego was not justified by

the facts);[21] *Jiminez v. Rodriguez, In re Rodriguez*, No. 05-19599 (ALG), Adv. Proc.

No. 06–01119 (ALG), 2008 WL 3200215, at *7 (Bankr. S.D.N.Y. Aug. 5, 2008)

(noting "[t]here is authority that an individual debtor causing his wholly-owned

corporation to transfer property can provide a basis for a denial of discharge under

§ 727(a)(2)(A)," and citing cases but finding the theory not justified on the facts); *In

re Lort*, 347 B.R. at 911 (remanding for consideration by bankruptcy court of

---

[21] In *In re Scott*, cited by the Hintzes, the court recognized a case in which the alter ego theory had been used to deny a discharge, *Compton v. Bonham (In re Bonham)*, 224 B.R. 114 (Bankr. D. Alaska 1998), but distinguished it on its facts, stating the facts in *Bonham* were "egregious" because the debtor had been using the corporation in a criminal *Ponzi* scheme. *In re Scott*, 462 B.R. at 742-43. On the facts of *Scott*, however (which did not involve a *Ponzi* scheme), the court first determined that the alter ego theory had not been alleged in the amended complaint and then concluded that, in any event, the facts did not justify its application because the debtor did not benefit individually from the transfer of corporate funds, which were ultimately used to pay *corporate* debts. Thus, the court did not consider the facts to constitute such an "extreme case" as to support a veil piercing analysis. *In re Scott*, 462 B.R. at 743. The court did not say, however, that alter ego could never be a viable theory.

CASE NO. 1:17cv18-MCR/GRJ [Lead Case]
CASE NO. 1:17cv101-MCR/GRJ [Member case]

whether an alter ego allegation was part of the proof or pleadings for purposes of § 727(a)(2)(A)); *Compton v. Bonham (In re Bonham)*, 224 B.R. 114, 116-17 (Bankr. D. Alaska 1998) (piercing the corporate veil where corporation was used in a *Ponzi* scheme and denying discharge under§ 727(a)(2)(A)); *In re Gherman*, 103 B.R. at 330-31 (applying Florida law to disregard corporate form of companies dominated by debtor to mislead creditors such that each was an alter ego, and denying discharge under § 727(a)(2)(A)); *see also Pellegrino v. Metro Unlimited, Inc. (In re Dakhillalah)*, 2010 WL 148457 (Bankr. M.D. Fla. Jan. 7, 2010) (finding debtor not entitled to discharge under 727(a)(3) and (a)(4)(A) because a corporation was the debtor's alter ego and thus allowing debt to be satisfied by collecting the corporation's assets); *Trustee v. Zhang (In re Zhang)*, 463 B.R. 66, 79 (Bankr. S.D. Ohio 2012) (collecting cases in which courts have applied or borrowed alter ego and reverse veil piercing concepts to disregard corporate distinctions and treat assets transferred as property of the debtor under § 727(a)(2)).[22] These cases demonstrate that, even assuming use of an alter ego theory is disfavored and difficult to prove as

---

[22] The court noted in *Zhang* that "Sixth Circuit and Ohio law recognize the alter ego theory to disregard the corporate fiction, but not reverse veil piercing principles." 463 B.R. at 80. The court explained that the reverse veil piercing doctrine is a distinct concept because it seeks to hold one vicariously liable for another's debts, while alter ego is a theory of direct liability because the two are considered the same when the corporate fiction is disregarded. *Id.* at 81 (considering Ohio law).

the Hintzes contend, alter ego and veil piercing concepts nonetheless can be viable means of establishing "property of the debtor" under § 727(a)(2).  Application of the theory will depend on state law and the facts at issue.[23]

Florida law regards a corporation as a separate legal entity, distinct from its owners, *Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. 3d DCA 2008), and imposes a "high regard for corporate ownership," *In re Pearlman*, 462 B.R. 849, 856 (Bankr. M.D. Fla. 2012).  Thus, a party faces "a very heavy burden" to overcome a corporation's separate existence and pierce the corporate veil.  *Hillsbury Holdings Corp. v. The Celotex Corp. (In re Hillsborough Holdings Corp.),* 166 B.R. 461, 468-69 (M.D. Fla. 1994); *see also In re Checiek*, 492 B.R. 918, 920-21 (Bankr. M.D. Fla. 2013) (Florida law permits courts to disregard the corporate form only in "extraordinary cases").  As explained by the Florida Supreme Court, courts will disregard the corporate form only if the corporation was either "organized or used to mislead creditors or to perpetrate a fraud upon them" or was used "as a means of evading liability with respect to a transaction that was, in truth, personal, and not

---

[23] In bankruptcy, state law defines a debtor's property rights and interests.  *See Butner v. United States*, 440 U.S. 48, 54-55 (1979) (stating "[p]roperty interests are created and defined by state law" unless a federal interest requires a different result).  Determining whether an interest in property is "property of the estate" is a federal question, but it is determined by considering "the nature and existence of the debtor's right to property" under state law.  *Title Max v. Wilber (In re Northington)*, 876 F.3d 1302, 1310 (11th Cir. 2017) (internal marks omitted).

corporate." *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114, 1119-20 (1984); *see also In re Hillsborough Holdings Corp.,* 166 B.R. at 468-69 (stating Florida law requires shareholder misconduct amounting to fraud on creditors to avoid "an existing personal liability").  Mere instrumentality or sole ownership of a corporation is not sufficient grounds to disregard corporate form; "so long as proper use is made of the fiction that the corporation is an entity apart from stockholders, the fiction will not be ignored." *Lipsig v. Ramlawi*, 760 So. 2d 170, 187 (Fla. 3d DCA 2000) (quoting *Mayer v. Eastwood, Smith & Co*., 164 So. 2d 684, 687 (Fla. 1935)); *see also Molinos Valle Del Cibao v. Lama*, 633 F.3d 1330, 1349 (11th Cir. 2011) (noting Florida courts do not easily disregard the corporate fiction).  This "proper use" limitation precludes a shareholder from using the corporation's limited liability status to defraud creditors, *see Molinos,* 633 F.3d at 1349-1350, as to a "*preexisting personal* liability," *Braswell v. Ryan Investm'ts, Ltd.*, 989 So. 2d 38, 39 (Fla. 3d DCA 2008) (emphasis added) (quoting *Estudios, Proyectos e Inversiones de Centro America, S.A. (EPICA) v. Swiss Bank Corp. (Overseas) S.A*., 507 So.2d 1119, 1120 (Fla. 3d DCA 1987)).

The Hintzes argue that using alter ego to find corporate property to be "property of the debtor," as opposed to using the theory to impose liability,

improperly conflates legal concepts.  Ordinarily, corporate veil piercing is used to hold a shareholder liable for corporate debts, and reverse veil piercing is used to hold a corporation liable for the debts of controlling shareholders.  *See Braswell*, 989 So. 2d at 38-39.  The Hintzes argue that it is improper to use the alter ego theory to "constructively convey assets to the wrongdoer shareholder," as opposed to imposing liability.  ECF No. 9, at 22-23.  The Court finds no improper mixing of concepts or "constructive conveyance" of property by using an alter ego theory to determine whether corporate property is actually "property of the debtor."  Although piercing the corporate veil on allegations of alter ego is considered a distinct cause of action in Florida,[24] the concept remains flexible and equitable in nature.  *See In re Checiek*, 492 B.R. 918, 920-21 (Bankr. M.D. Fla. 2013) (stating veil piercing and reverse veil piercing under Florida law are equitable remedies used to prevent fraudulent or improper use of the corporate form that has caused injury to a creditor); *see also Eckhardt v. United States*, 463 F. App'x. 852, 855 (11th Cir. 2012)

_____

[24] By contrast, under federal practice, alter ego is not considered a separate cause of action but merely a theory and means of imposing liability in connection with an underlying cause of action.  *See Lan Li v. Walsh*, No. 16-81871-CIV, 2017 WL 3140522, at *10 (S.D. Fla. July 24, 2017) (dismissing an "alter ego" count asserted as a separate claim but allowing it to be pled in the body of the complaint; noting, however, that Florida law allows alter ego as a separate cause of action); *Raimbeault v. Accurate Mach. & Tool, LLC*, No. 14-CIV-20136, 2014 WL 5795187, at *9 (S.D. Fla. Oct. 2, 2014) (same).

(unpublished) (using the term "alter ego" interchangeably with the concept of piercing the corporate veil when discussing Florida law). Indeed, alter ego and veil piercing are not necessarily bound to a particular remedy. *See Salkin v. Chira (In re Chira),* 353 B.R. 693, 735-36 (Bankr. S.D. Fla. 2006) (finding that, where corporation was a mere instrumentality and used as an instrument of fraud, reverse veil piercing was permitted under Florida law and bankruptcy law, but finding it "sufficient for the purposes of equity" in that case to merely declare a sham business lease of no further effect going forward). The court observed in *In re Chira* that cases "on piercing and reverse piercing the corporate veil [are] illustrative of the extent to which equity may be involved by bankruptcy courts to assure an equitable result." *Id.* Under an alter ego theory, if proven, "a judgment debtor and an alter ego are treated as the same entity," and thus a description of "any property of the judgment debtor" may include property of an alleged alter ego of the judgment debtor. *Longo v. Associated Limousine Servs., Inc*., No. 4D17-516, 2018 WL 527016, at *5 (Fla. Dist. Ct. App. Jan. 24, 2018) (discussing proceedings supplementary under Florida law); *see also id.* (stating, "because the law deems a corporation and its alter ego to be a single entity, a debtor corporation has an equitable interest in the assets of its alter ego"). Essentially, "by piercing the

corporate veil, the party proves that the two entities legally are the same, not two different entities"—"they are not really debtor and non-debtor, but one." *In re Pearlman*, 462 B.R. at 855. Thus, the Court finds that if the facts support alter ego veil piercing, then the Hintzes and TZ1 are one in the same,[25] and consequently, TZ1's assets would be properly considered "property of the debtor."

To pierce the corporate veil and justify disregarding the separateness of the corporate form, Florida law requires proof of the following:

> (1)    the shareholder dominated and controlled the corporation to such an extent that its separate existence was in fact non-existent but only an alter ego of the shareholder;
>
> (2)    the corporate form was used fraudulently or for an improper purpose; and
>
> (3)    the fraudulent or improper use of the corporate form caused injury to the claimant.

*See Gasparini*, 972 So. 2d at 1055. The Hintzes argue on appeal that the Bankruptcy Court's findings on each element are in error.

---

[25] The Hintzes argue that if in fact they are treated as the same entity with TZ1, then the fact that they personally received consideration for the transfer of the corporate assets should not be viewed as a badge of fraud. This argument improperly puts the cart before the horse. In order to find alter ego for purposes of veil piercing, there must be a finding of fraud, and thus, the showing of fraud is a prerequisite and will not subsequently be disregarded on finding that the Hintzes and TZ1 in fact should be treated as the same entity.

CASE NO. 1:17cv18-MCR/GRJ [Lead Case]
CASE NO. 1:17cv101-MCR/GRJ [Member case]

(1) The Bankruptcy Court found that the Hintzes dominated and controlled TZ1 to such an extent that it had no independent existence, citing correspondence and emails, including statements by Mrs. Hintze herself indicating confusion about whether she and Mr. Hintz were separate from TZ1, stating her belief that "we are TZ." The emails show that the business was mingled with the Hintzes personally to such an extent that their attorney waived any conflict and represented them all. The court found that the Hintzes failed to relinquish control over the company's finances or business to a board, and to the extent there was a board, it was effectively non-existent because the Hintzes maintained control of TZ1's finances and all business affairs and decisions.

The Hintzes also argue that their conduct was merely "clever" or that they operated in a "loose and haphazard manner" but that this is an insufficient basis for disregarding the corporate form. *See Hilton Oil Transport v. Oil Transport Co.*, 659 So. 2d 1141, 1152-53 (Fla. 3d DCA 1995) (stating it is not unusual for a closely held corporation to be operated with poor business practices but requiring conduct that is fraudulent, improper, or illegal to pierce the corporate veil); *111 Properties, Inc. v. Lassiter*, 605 So. 2d 123, 124-26 (Fla. 4th DCA 1992) (disguising a purchase by "cleverly" forming a corporation for the purchase was not considered the type of

misuse of corporate form that gives rise to alter ego veil piercing).  This case is not about a loose operation or a lack of corporate formalities.  The Hintzes disregarded the corporate form by using corporate assets to guaranty a personal debt and later causing TZ1 to transfer all its assets, which had been pledged to guaranty payment of that preexisting personal debt.  Moreover, they orchestrated a transfer of TZ1's assets to a friend in exchange for an expungement of a different preexisting personal debt, which then left no "proceeds" from which the Investor Creditors could collect on their notes.  This clearly shows that the Hintzes dominated and controlled the corporation.

The Hintzes also argue that veil piercing is not available in Florida on alter ego alone, even when a controlling shareholder is alleged to have fraudulently transferred a corporate asset, citing *Riley v. Fatt*, 47 So. 2d 769, 773 (Fla. 1950), because Florida law provides a more durable corporate shell in comparison with other states, which disregard the corporate form on "considerations of justice," *see* ECF No. 18, at 11-12 (collecting cases from other states), and Florida law provides various other statutory remedies for fraudulent transfer, as noted in *Riley*.  These arguments are unavailing and do not provide grounds for concluding that alter ego veil piercing does not apply here.  While the Court agrees that Florida law requires

proof of the strict elements cited above to pierce the corporate veil (not mere instrumentality), contrary to some other states' law that the Hintzes cite, the Bankruptcy Court did not rely on subjective considerations to the exclusion of Florida law.  Instead, the court appropriately made explicit findings under each of Florida's required elements and did not rely on mere instrumentality, as the Hintzes argue.  *See In re Hintze*, 570 B.R. at 385-87.  As to their contention that other remedies exist in Florida law, relying on *Riley*, the Court finds nothing in *Riley* that would preclude the Bankruptcy Court from applying Florida's veil piercing caselaw in this instance.[26]

(2) The Bankruptcy Court found that the Hintzes used the corporate form fraudulently by the circumstances presented, which included not disclosing the transfer of TZ1 assets and taking personal loan forgiveness as proceeds of the sale, with no consideration to TZ1 and obtaining no "proceeds" that could have been

---

[26] In *Riley*, the Florida Supreme Court noted that there were alternate ways of recouping fraudulent transfers under Florida law aside from veil piercing.  47 So. 2d at 773.  The Florida Supreme Court referenced the existence of other state law remedies only after finding no pleading or proof in the supplementary proceeding before it that the corporation had been used for a fraudulent purpose.  Thus, the corporate veil could not be pierced in that case to allow the corporate creditor to execute on assets of an individual shareholder.  The court explained, however, that if, as also alleged in the case, the individual had in fact diverted corporate funds, state law did provide "several appropriate remedies for their recapture."  *Id.*  This simply does not apply in the instant case.

distributed to the Investor Creditors pursuant to the terms of the notes.  The Hintzes argue that the Bankruptcy Court merely selected "colorful comments" from their emails and that their conduct amounted only to a preferential transfer.  The Court disagrees with this characterization and concludes that the record supports the Bankruptcy Court's detailed findings of several badges of fraud.

(3)  Finally, the Bankruptcy Court also determined that the Hintzes' fraudulent use of TZ1 caused injury to the Investor Creditors by leaving them without a remedy on their personal notes to the Hintzes, three of which had pledged TZ1 assets as collateral and promised the Investor Creditors the proceeds from any sale of TZ1 assets exceeding $10,000.  The Hintzes argue that this conclusion is error because there was no finding of material damage.  The Hintzes contend that the pledge of corporate assets on a personal note was without consideration to the corporation, and thus is unenforceable, and the only injury from the transfer of corporate assets would have been to creditors of TZ1, not the Hintzes' creditors.  The Court disagrees.  The Bankruptcy Court plainly found material damage to the Investor Creditors, concluding that the transfer rendered the terms of the note a nullity.  Regardless of whether the note would have been enforceable to execute directly on company assets, it clearly was sufficient to execute on the Hintzes 100%

membership interest, which previously had value only based on the corporation's assets. As the sole owners of TZ1, the Hintzes promised to pay the Investor Creditors from any sale of those assets exceeding $10,000, but instead of obtaining payment for company assets transferred, they obtained *personal* loan forgiveness, which was of no benefit to the company and served to deny any payment or remedy to the Investor Creditors from the Hintzes' only asset. The Investor Creditors were undoubtedly left without a remedy by the transaction.

Having found the elements required to pierce the corporate veil based on the alter ego theory plus fraud, the Bankruptcy Court was justified in finding that the TZ1 assets transferred were in fact "property of the debtors" under § 727(a)(2)(A). Therefore, discharge was properly denied.

Accordingly, the Bankruptcy Court's judgment denying the Hintzes a discharge is **AFFIRMED**. The Clerk is directed to enter a copy of this Order in this case and in the Member Case, No. 1:17cv101-MCR/GRJ, enter judgment against the Hintzes in both cases, and close the files.

**DONE AND ORDERED** this 26th day of March 2018.

*M. Casey Rodgers*

**M. CASEY RODGERS**
**CHIEF UNITED STATES DISTRICT JUDGE**

CASE NO. 1:17cv18-MCR/GRJ [Lead Case]
CASE NO. 1:17cv101-MCR/GRJ [Member case]