**UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

September 13, 2018

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 18-11720-EE
Case Style: Matthew Hintze, et al v. John Spence, et al
District Court Docket No: 1:17-cv-00018-MCR-GRJ
Secondary Case Number: 13-bkc-01007-KKS

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, costs taxed against the appellants.

Please use the most recent version of the Bill of Costs form available on the court's website at www.ca11.uscourts.gov.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Elora Jackson, EE at (404) 335-6173.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Djuanna Clark
Phone #: 404-335-6161

OPIN-1A Issuance of Opinion With Costs

Case 1:17-cv-00018-MCR-GRJ   Document 46   Filed 09/13/18   Page 2 of 15
Case: 18-11720   Date Filed: 09/13/2018   Page: 1 of 14

[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-11720
Non-Argument Calendar
_____

D.C. Docket No. 1:17-cv-00018-MCR-GRJ,
Bkcy No. 13-bkc-01007-KKS

In re:

MATTHEW BRUCE HINTZE,
LARINA K. HINTZE,

                                                                                                Debtors.
_____

1:17-CV-00018-MCR-GRJ

MATTHEW BRUCE HINTZE,
LARINA K. HINTZE,

                                                                                  Plaintiffs - Appellants,

versus

JOHN SPENCE,
SHEILA SPENCE,
INTERMED BIOLOGICAL SERVICE, INC.,
DAVID WHITNEY,
FLH HOLDINGS OF FLORIDA LLC,

                                                                                  Defendants - Appellees.

_____

1:17-CV-00101-MCR-GRJ

MATTHEW BRUCE HINTZE,
LARINA K. HINTZE,

                                                       Plaintiffs - Appellants,

versus

THERESA M. BENDER,

                                                       Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(September 13, 2018)

Before TJOFLAT, MARTIN, and HULL, Circuit Judges.

PER CURIAM:

Matthew and Larina Hintze[1] appeal from the district court's order denying the discharge of debt to the Hintzes in their Chapter 7 bankruptcy proceeding. The district court found that the Hintzes' transfer of assets from their tutoring company to a friendly creditor before filing personal bankruptcy was an attempt to "hinder, delay, or defraud a creditor" under 11 U.S.C. § 727(a)(2)(A). The court's finding rested on two alternative holdings: (1) the transfer of assets "destroyed" the

---

[1] Because the Hintzes share a last name, we distinguish between them by referencing their first.

Hintzes' membership interests in their tutoring company; or (2) the transfer of assets was a transfer of "property of the debtor," because the tutoring company was the Hintzes' alter ego. On appeal, the Hintzes challenge both of these holdings. After careful consideration, we affirm.

I.

On November 1, 2012, the Hintzes filed for personal bankruptcy.[2] At the time, they owned 100% of their tutoring company, TutoringZone, LC. TutoringZone offered tutoring services to university students and, as of 2010, had more than $1.6 million in gross revenues.

Before the Hintzes became 100% owners of TutoringZone, Ethan Fieldman was a part owner. In 2010, Matthew and Fieldman had a falling out. Matthew wanted to buy Fieldman's 50% ownership interest in the company, but the $835,000 price was too high for the Hintzes to afford by themselves. They borrowed money from others including: $443,578.08 from John and Sheila Spence; InterMed Biomedical Services, Inc.; David Whitney; and FLH Holdings of Florida, LLC ("Creditors"), collectively. Three of the four promissory notes with these creditors pledged TutoringZone's assets, as well as the Hintzes' personal property, as collateral. The pledge-of-asset provisions also stated that

---

[2] This history is derived from the findings of the bankruptcy court. The Hintzes have not disputed these findings before the district court or this Court.

proceeds from the sale of any TutoringZone assets exceeding $10,000 must first be applied to pay off the note.

After selling his stake in TutoringZone to the Hintzes, Fieldman set up a rival tutoring company, Study Edge. Study Edge did well and TutoringZone's revenues and cash flow fell significantly. By May 2012, the Hintzes had to ask the Creditors for more money to help TutoringZone pay its employees, but the Creditors refused. The Hintzes then turned to Christopher James.

James is a finance professor and Matthew's friend and mentor. He had lent the Hintzes $475,000 in 2010 and 2011, $100,000 of which went toward buying Fieldman out. With the help of an attorney, James and the Hintzes came up with a plan—chronicled in emails—to rescue TutoringZone and the Hintzes from financial ruin. According to this plan, James would start a new company called TutoringZone II, Inc. ("TZ II"), and the Hintzes would transfer most of the assets of the first TutoringZone to the second. Then they would allow the first TutoringZone to fail and the second to carry on the business.

On May 22, 2012, TutoringZone leased its intellectual property and some other assets to James for $75,000, which it used to pay employees. The leased assets included "[v]ideo and audio, workbooks, tests, instructional materials, graphics, logos, and other materials developed by [TutoringZone] for delivery of tutoring services, including the source codes and source documents, . . . and all

intellectual property rights therein," as well as physical assets like desks and computers. On June 4, 2012, TutoringZone transferred these assets to TZ II.[3] TutoringZone received no payment from TZ II. Instead, James forgave $200,000 of the $475,000 owed to him by the Hintzes. In an email, James described his "involvement in Tutoring Zone" as an effort "to shelter the business from some creditors." He said Matthew "stills runs his business but is now an employee of [TZ II]."

The Hintzes deliberately did not tell the Creditors about the transfer of assets or the creation of TZ II. Although the Creditors requested financial information about TutoringZone several times from May 2012 through July, the Hintzes delayed or failed to respond to these requests. They warned each other about the need to complete the scheme "prior to ANYONE fil[ing] lawsuits" and the need to "be very careful in communications." The Hintzes continued to operate as TutoringZone through the summer of 2012. In August, Matthew received his first paycheck from TZ II and eventually all but two of TutoringZone's employees were working for TZ II. TZ II used the same business name ("TutoringZone"), logo, phone numbers, web address, advertising materials, and tutoring materials that TutoringZone had, making it appear TutoringZone remained in business.

---

[3] The Hintzes executed the lease and transfer documents for TutoringZone.

Before the asset transfer, the Hintzes' membership interest in TutoringZone was their only non-exempt asset of value. At that time, the company was valued at $350,000 on the low end and $3 million on the high end.[4] After the transfer, TutoringZone "was left a shell with no assets and no income." Notably, in their bankruptcy petition, the Hintzes valued their membership interest in TutoringZone at $100. After the Hintzes filed for bankruptcy, the Creditors discovered the deception and objected to discharge of the Hintzes' indebtedness to them.

After a bench trial, the bankruptcy court found in favor of the Creditors, determining that the Hintzes' debt could not be discharged under § 727(a)(2)(A). The district court affirmed on appeal.

II.

This Court "sits as a second court of review" in a bankruptcy case. In re Fisher Island Invs., Inc., 778 F.3d 1172, 1189 (11th Cir. 2015) (quotation marks omitted). "Where the district court affirms the bankruptcy court's order, we review the bankruptcy court's decision." Id. We "examine[] independently the factual and legal determinations of the bankruptcy court and employ[] the same standards of review as the district court." Id. (quotation marks omitted). Because

---

[4] The $350,000 valuation came from Fieldman, who offered to buy TutoringZone that summer as well. Matthew valued the company at $1.5 million based on its 2011 income and $2 million based on its 2012 income, but wanted a $3 million valuation. Larina valued the company at $2,520,000.

6

the Hintzes do not challenge the bankruptcy court's findings of fact, we review only the legal conclusions in this case. These we review de novo. Id.

### III.

"The Bankruptcy Code favors discharge of an honest debtor's obligations." In re Jennings, 533 F.3d 1333, 1338 (11th Cir. 2008) (per curiam). Under 11 U.S.C. § 727(a)(2)(A), a debtor can be denied a discharge if "property of the debtor" is transferred or destroyed "by the debtor or with the debtor's permission within one year of the filing of the bankruptcy petition, and . . . with the intent to hinder, delay, or defraud a creditor." Id. at 1339. To stop a discharge under § 727(a)(2)(A), a creditor must show by a preponderance of the evidence that the challenged action (1) happened in the year before the bankruptcy petition was filed; (2) was done "with actual intent to hinder, delay, or defraud a creditor"; (3) was an act of the debtor; and (4) involved the transfer, removal, destruction, mutilation, or concealment of "property of the debtor." Id.

The Hintzes don't challenge the bankruptcy court's findings of fact and present no argument about the first three Jennings factors.[5] Thus, at issue in this

---

[5] The Hintzes describe the bankruptcy court's findings in a way that does not acknowledge the holding that they acted with intent to hinder, delay, or defraud a creditor. Their characterization of some of these findings also appears to reflect disagreement with them. Nonetheless, they presented no argument that any of these findings are clearly erroneous. Their failure to do so, here and before the district court, means their challenge is abandoned. See Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 681–82 (11th Cir. 2014).

case is the fourth factor. The bankruptcy court found the Creditors satisfied their burden in two, alternative ways by showing the Hintzes: (1) "destroyed" their 100% membership interest in TutoringZone when they transferred TutoringZone's assets to TZ II for no consideration because the transfer left TutoringZone a "shell with no assets and no income"; or (2) "transferred" "property of the debtor" when they transferred TutoringZone's assets to TZ II. The district court affirmed both those holdings.

The Hintzes first argue that their membership interest in TutoringZone was not "destroyed" because the deal between TutoringZone and TZ II brought in $75,000 and the membership interest was sold by the bankruptcy court for $120,000 in 2016. They also argue that a "reduction in value" is not a synonym for "destroy," particularly when the value reduction could be repaired.[6] The Hintzes challenge the second holding by arguing that TutoringZone's assets are not "property of the debtor." They argue that the bankruptcy court improperly expanded the reach of § 727(a)(2)(A) by using "alter ego" and "reverse veil piercing" theories under Florida law to conclude that TutoringZone's assets were

---

[6] In the district court's order, the court stated the Hintzes belatedly raised an argument that their membership interest was not "property of the debtor" and declined to consider it. The Hintzes appear to make the same argument here on appeal, insofar as they rely on the same authority, but they argue that the authority shows "destroy" cannot mean "reduction in value." To the extent this argument is an attempt to raise again the argument that was not properly before the district court, we decline to consider it. See Ramirez v. Sec'y, U.S. Dep't of Transp., 686 F.3d 1239, 1249–50 (11th Cir. 2012). But, to the extent this is offered as support for the Hintzes' main argument that they did not "destroy" their membership interest in TutoringZone, we consider it.

"property of the debtor." Last, they argue that even if such theories were appropriate, the bankruptcy court's findings of fact do not meet the veil-piercing requirements of Florida law.

A.

We begin with the Hintzes' 100% membership interest in TutoringZone because there is no dispute that this was "property of the debtor." The Hintzes accept the bankruptcy court's findings, so there is no dispute that the value of their membership interest was, at the very least, significantly reduced by their transfer of assets from TutoringZone to TZ II. The only questions before us are legal ones: What does it mean to "destroy" property? Can it include a significant reduction in value or does it require a complete annihilation of value? For something to be destroyed, must it be beyond repair forever?

We start with the plain meaning of the text. See Am. Bankers Ins. Grp. v. United States, 408 F.3d 1328, 1332 (11th Cir. 2005). Webster's defines "destroy" in several ways: "[t]o ruin completely," "[t]o tear down or break up," "[t]o put an end to," "[t]o kill," "[t]o render useless or ineffective," and "[t]o subdue or defeat completely." Webster's New College Dictionary 314 (3d ed. 2008). Considering these meanings altogether, two things become clear. First, the meaning of "destroy" depends somewhat on the object that follows. Second, most meanings of "destroy" have some sense of permanence attached to them. While some of these

9

indicate the state of being destroyed is an irreparable condition, others indicate that it is not an easily remedied condition.  For example, a fire might "destroy" a room so that it is "ruin[ed] completely."  Rebuilding the room is possible, but it would require investment of significant labor and resources, the same or nearly the same as building a room from scratch.

Applying these understandings, we first reject the Hintzes' argument that "destroy" can only mean "physical destruction."  Ordinary use of the word includes its application to intangible things, such as "confidence" and "reputation."  And as "property of the debtor" includes intangible property, "destroy" as used in § 727(a)(2) means more than just "physical destruction."  See In re Coady, 588 F.3d 1312, 1316 (11th Cir. 2009) (per curiam) (affirming the bankruptcy court's conclusion that debtor's "equitable interest in businesses he never legally owned [] constitute[d] 'property of the debtor' within the scope of § 727(a)(2)(A)").

The Hintzes next argue that a reduction in value is not enough to conclude property was "destroyed" within the meaning of § 727(a)(2).  This is true, as far as it goes, but we reject the idea that the statute requires a total, irreparable reduction in value.  Instead, for intangible property like a membership interest in a company, we understand "destroy" to require a significant enough reduction in value such that restoring the membership interest's value would require the same or nearly the

10

same investment of labor and resources as building it from scratch. That is what happened here.

The Hintzes had a 100% membership interest in the company, so the value of the membership interest was coextensive with the value of TutoringZone. As the bankruptcy court found, before the transfer of assets, TutoringZone was valued at a minimum of $350,000 and at a maximum of $3 million dollars. The court also found that, after the transfer of assets, TutoringZone was left a shell with no assets or income. When they filed their bankruptcy petition, the Hintzes valued their interest at $100.

One hundred dollars is, of course, still some value. Yet restoring the membership interest's value would require restoring TutoringZone to a functioning company with assets and income. And that would require the same or nearly the same investment of resources as starting the company from scratch: The asset transfer included transfer of intellectual property, so restoring TutoringZone would require development of whole new lesson plans, workbooks, tests, software, and the like. It would require purchasing computers and physical desks. It would require development of new logos, graphics, websites, and advertising material. And because TutoringZone has no employees, it would also need to hire new ones to deliver its tutoring services and manage its affairs. Last, TutoringZone would need to restore its reputation with the students it serves. These are not easy things.

We thus conclude the Hintzes' transfer of assets from TutoringZone to TZ II "destroyed" the value of their membership interest in TutoringZone.[7]

The Hintzes argue their membership interest had more value than just $100. They first note that the asset lease brought in $75,000 and that they sold some nontransferred assets for cash. However, the asset lease was entered into before the asset transfer and the money was used to pay TutoringZone's employees at the time. And the nontransferred assets consisted of only 500–600 chairs sold for a few thousand dollars on Craigslist. That is not enough to change our conclusion.

The Hintzes also point out that their membership interest was eventually sold for $120,000.[8] The district court found the $120,000 value "lay in the litigation rights that were simultaneously transferred with the membership interest." The Hintzes do not challenge this finding by the district court and the record supports it: The bankruptcy trustee determined TutoringZone had a fraudulent transfer action against TZ II and put up for sale standing to bring that suit along with the membership interest. The two high bidders were James, who owns TZ II ($45,000), and TZ Acquisitions, a company owned by Fieldman

---

[7] In a single sentence and without citing to any supporting authority, the Hintzes argue the value of the membership interest could be "'repaired' via avoidance actions to recover the transferred [] assets." This argument is abandoned for failure to adequately brief it. See Sapuppo, 739 F.3d at 681–82.

[8] The Hintzes refer here to the record of the associated bankruptcy case. Over the Creditors' objection, the district court took judicial notice of this record. The district court made findings based on what that record showed. On appeal to us, the Hintzes do not challenge those findings and the Creditors do not challenge the district court's ruling on judicial notice.

($120,000). If James bought the membership interest, he would no longer have to worry about a lawsuit against TZ II. And if TZ Acquisitions bought the membership interest, it could sue for return of TutoringZone's assets. Thus, the two high bidders were both motivated by the litigation rights, and not TutoringZone itself. The district court rejected the Hintzes' argument that their membership interest had value based on this right to sue, holding that accepting it would be against the equitable nature of bankruptcy proceedings.

We reject the Hintzes' argument that their membership interest had a value of $120,000 based on TutoringZone's right to sue for fraudulent transfer. First, the $120,000 valuation of the litigation rights does not change the fact that TutoringZone was no longer a functioning company when the Hintzes filed for bankruptcy.

Second, we agree with the district court that accepting this argument would be contrary to the equitable nature of bankruptcy proceedings. Any fraudulent transfer action brought by TutoringZone would necessarily be based on the Hintzes' transfer of assets from TutoringZone to TZ II for no consideration or in consideration for $200,000 of personal loan forgiveness. Thus, the Hintzes' argument can be summed up as follows: Their fraudulent conduct created a new valuable asset—right to sue for fraudulent transfer—and thus they did not fraudulently destroy the value of their membership interest. Because "courts of

bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity," this argument cannot save the Hintzes from the denial of a discharge under § 727(a)(2).  See Pepper v. Litton, 308 U.S. 295, 304, 60 S. Ct. 238, 244 (1939); Jennings, 533 F.3d at 1338.

B.

Our conclusion that the Hintzes destroyed the value of their membership interest in TutoringZone within the meaning of § 727(a)(2) is enough to affirm the bankruptcy court's denial of discharge.  Thus, we need not and do not consider their arguments challenging the bankruptcy court's alternative holding.

**AFFIRMED.**